Filed 6/10/25  In re Harris on Habeas Corpus CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| In re RIVER HARRIS,<br><br>on Habeas Corpus. | B334559<br><br>(Los Angeles County<br>Super. Ct. No. LA093615) |
|---|---|

Habeas proceedings after a judgment of the Superior Court of Los Angeles County, Gregori A. Dohi, Judge.  Petition granted.

Debbie Yen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Shezad H. Thakor, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted River Harris of voluntary manslaughter. Harris petitions for a writ of habeas corpus on the ground that evidence discovered after trial about the victim's out-of-state convictions constitutes "new evidence" within the meaning of Penal Code section 1437, subdivision (b) and would have supported his self-defense theory and likely caused a different result. We agree and thus grant the writ and remand for further proceedings.

## BACKGROUND

### A. The Shooting

On October 3, 2020, Curtis Deturk, Jason McKenney, and Michael Cole sat outside Noho Pizza restaurant in North Hollywood, Deturk playing his guitar.

Harris walked past, and after an interaction about which the testimony conflicted, fired his gun five times at Deturk, striking him three times and killing him.

### B. Trial

The Los Angeles County District Attorney charged Harris with murder and alleged that he personally and intentionally discharged a firearm in the commission of the murder within the meaning of Penal Code section 12022.53, subdivisions (b), (c), and (d).[1]

At trial, Dr. Scott Luzi, who performed the autopsy on Deturk, testified that Deturk had extremely high levels of methamphetamine in his system at the time of his death, which could cause erratic behavior and violence. Dr. Luzi testified that

---

[1] Undesignated statutory references are to the Penal Code.

Deturk suffered three bullet wounds: a grazing wound to the right thigh; a wound in the left buttock at a downward angle; and the fatal wound to the left side of his torso.  The order of the wounds could not be determined.  Dr. Luzi testified that Deturk was turning away from the shooter when he was shot.

McKenney testified for the prosecution.  The evening of the shooting, McKenney was sitting in a group with Deturk and Cole, eating and listening to music and Deturk playing his guitar.  McKenney, asked if Deturk acted "erratic in any way," testified, "Not that I can remember, no."  McKenney also testified that he did not see Deturk act violent toward him or anyone else.  He stated that Deturk asked Harris for 35 cents, to which Harris responded by brandishing his gun and saying, "No, but I have this for you.  Any of you say a word and I'll spray all of you."  After this exchange, Harris turned and put away his gun.  Deturk then said, "God bless you," and Harris turned back around, drew his gun again, and fired several shots at Deturk, who looked like he was trying to turn and run away.  McKenney testified that Deturk's tone of voice when he was speaking that evening was "calm and pleasant."

On cross-examination, it was revealed that at the preliminary hearing, McKenney had testified:  "[Deturk] might have lifted [the guitar] and it might have looked like he was going to try to hit.  Not at all.  He just adjusted it just so he could keep playing."

It was also revealed that McKenney was previously convicted of a misdemeanor charge of criminal threats in 2019 for exhibiting a deadly weapon and a misdemeanor charge of domestic violence in 2021.  He was also banned from the 7-Eleven

in the area and had got into a wrestling match with the security guard there.

Cole was deemed to be unavailable at trial, and portions of his police interviews and preliminary hearing testimony were read to the jury.

Cole told police he thought Harris was "justified" in shooting Deturk. Cole stated, "[Y]ou don't just pick up the guitar like a ball bat and go swing it at someone you don't know." Deturk asked Harris for 35 cents, but Harris said he had nothing, after which Deturk was "going like this with the guitar," which prompted Harris to say, "Don't swing your guitar at me." When Harris began to walk away, Deturk said, "God bless you." Harris did not hear him, so he turned around and asked, "What'd you say?" Cole stated that Deturk muttered, "Fuck you," and "went like this with the guitar." When the officer asked, "So this guy put up the guitar like he was going to hit him?" Cole responded, "Like a ball bat, yeah." Deturk "started charging" Harris, who said, "I'm not fucking with you" a few times, "don't try to swing the guitar at me or I'm gonna shoot you," and "don't swing that guitar at me, bro, you're trying to bodily harm me." Harris then shot Deturk and ran away.

Cole's testimony at the preliminary hearing included additional details. He testified that Deturk propped his guitar over his shoulder like a baseball bat, and Harris said, "Don't try to hit me with your guitar. Don't try to run up on me," adding, "I know you guys got a gun . . . I'm going to leave now. No trouble."

In addition, Cole testified that another man, who appeared to have a handgun in his waistband, argued with Harris. The unidentified man told Deturk, "Let's go. Let's get him. Let's go." Harris said, "What you say? Are you threatening to rob me?"

4

Harris walked towards Deturk and the other man and said, "I'm not going to play with you clowns . . . I'll shoot you." The unidentified man reached for his gun, which slipped down his pants. Harris said, "You ain't going to do nothing. Don't try to hit me with your guitar. Don't pull your little pistol out on me." After a short back-and-forth, during which Deturk said, "God bless you," Deturk "charged" with the guitar like he was going to hit Harris, while the unidentified man motioned as if to draw his gun. Harris shot Deturk, the unidentified man fired a few shots, and he and Harris continued to exchange 16 to 24 rounds. Cole thought he saw Harris's bullets bounce off the unidentified man. Cole admitted he never mentioned a second shooter or gun to police.

Harris testified that on the night of the shooting, he left his apartment around 10:00 p.m. to walk to a nearby liquor store, carrying his gun for protection. As he passed Noho Pizza, a man from among a group of five people said to him, "What you got for me?" Harris replied that he did not have anything, but the man said, "No. You got something for me," and took a step closer. Believing he was about to be robbed, Harris told the man to back up, drew his gun, and said, "This is all I got." The man paused, and Harris put the gun back into his pocket and turned to walk away.

Harris then heard footsteps, and someone said, "Fuck you." He turned around and saw Deturk, who appeared "jittery," holding his guitar upright about three feet away from him. Harris drew his gun again and told Deturk to "back the fuck up and not to hit [him] with the guitar." Deturk "cock[ed] the guitar back and lunged" at Harris, who fired his gun once. When Deturk continued to move forward, Harris fired the gun four

more times, aiming downward because he did not want to kill Deturk. Harris then ran back to his apartment.

Harris testified that he had never fired that gun before, and shot Deturk only because he feared Deturk was going to injure him.

Audio of the incident confirmed that Harris fired five shots, and hesitated between the first shot and the remaining four.

In closing argument, the prosecutor stated, "[T]he evidence does not support the defense claim that Curtis was violent that night." The prosecutor further argued, "[McKenney] described Curtis as having a good nature and being pleasant. I asked if he was erratic that night, and McKenney said no. I asked if Curtis was violent that night, McKenney said no."

During deliberations, the jury asked for a readback of McKenney's testimony about Deturk adjusting his guitar as he approached Harris.

The jury acquitted Harris of murder but found him guilty of the lesser included offense of voluntary manslaughter, and found aggravating factors to be true. The jury also indicated on the verdict form that it acquitted Harris of involuntary manslaughter, although the trial court had instructed that the jury should leave that portion of the form blank if it convicted Harris of a greater offense.

For the sentencing hearing, which occurred in June 2022, 41 different people wrote 43 letters supporting Harris and describing the positive impact he had on their lives. The trial court granted the People's motion to replace the gun allegation under section 12022.53 (which applies to murder) with a gun allegation under section 12022.5 (which applies to manslaughter). The court denied Harris's motion for a new trial

6

and sentenced him to the mid term of six years in state prison for the manslaughter conviction plus the high term of ten years for the gun allegation.

### C.    Posttrial Evidence

After trial, Harris's appellate counsel, Debbie Yen, discovered that Deturk had suffered a total of five convictions in Indiana for offenses involving violence and two for resisting law enforcement, and McKenney suffered several convictions in Massachusetts for offenses involving moral turpitude.

### D.    Petition

Harris petitions for a writ of habeas corpus on the grounds that:  Evidence of Deturk's out-of-state convictions for violent offenses constitutes new evidence that more likely than not would have changed the outcome of the case; the prosecution suppressed evidence in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*); and trial counsel provided ineffective assistance in violation of Harris's sixth and fourteenth amendment rights.

Harris alleges the People suppressed evidence that Deturk had been convicted multiple times for violent offenses, which Harris asserts would have supported his claim of self-defense. He alleges that defense counsel rendered ineffective assistance by failing to conduct a reasonable investigation and present evidence of both Deturk's and McKenney's out-of-state convictions, the latter of which would have impeached the credibility of the prosecution's key witness.

To support his allegations, Harris attaches as exhibits the declarations of Jovan Blacknell, his trial counsel, who asserts that the prosecution affirmatively misrepresented that Deturk's

"FBI rap sheet" showed no convictions, and of Yen, who asserts that evidence of Deturk's convictions was not presented at trial, was discovered only after trial, has been presented without substantial delay, is admissible, and is sufficiently material and credible that it more likely than not would have changed the outcome of the case.

### 1. Blacknell Declaration

Blacknell declares identity was not in dispute at trial, and the defense hinged on the theory that Deturk attacked Harris with his guitar when Harris was extricating himself from a confrontation Deturk initiated. Blacknell declares it was crucial to Harris's self-defense claim that Deturk's history of violence be revealed so he could be portrayed as the aggressor.

Prior to trial, Blacknell declares, the prosecution represented that Deturk's "FBI rap sheet" did not reflect any convictions, and disclosed only a Lexis Nexis printout indicating that Deturk was convicted of a sexual battery in Indiana in January of 2020 and a news article indicating he had been arrested in Indiana in 2017 for sexual battery. Blacknell received similar information from Harris's mother. Blacknell relied on the prosecution's assertions and did not attempt to obtain further evidence concerning Deturk's criminal history.

Blacknell supports his declaration with copies of the documents to which he refers.

### 2. Yen Declaration

Yen declares that she submitted a Freedom of Information Act request to the FBI on May 10, 2023. On July 21, 2023, the FBI responded with Deturk's "rap sheet," which showed that he

8

pleaded guilty to sexual battery on January 20, 2020 and was sentenced to two and a half years in prison. The rap sheet also showed arrests in Indiana on July 31, 2011 (battery), June 2, 2013 (burglary), and June 1, 2017 (battery and resisting a law enforcement officer), and miscellaneous other arrests not involving crimes of violence.

Armed with this information, Yen submitted a public records request to Kosciusko County, Indiana. On August 3, 2023, the county clerk's office directed Yen to MyCase.IN.gov, where she received certified court orders and judgments showing that Deturk suffered five convictions for battery and two for resisting law enforcement while in Indiana.

Yen supports her declaration with certified copies of the documents she references.

## E.    Return

The Attorney General filed an informal response, and after we issued an order to show cause, submitted a return in which the state broadly denies all of petitioner's factual allegations.

In his brief supporting the return, however, Respondent concedes that Deturk possessed a more significant criminal history than the sexual battery conviction that was known at trial, and further concedes that these convictions may have been favorable to the defense because they were relevant and admissible to show Deturk's conformity with a violent character.

At oral argument, Respondent also conceded that Yen's discovery of Deturk's criminal history constitutes "new evidence" within the meaning of section 1473.

Respondent neither admits nor denies that Yen's new evidence is credible and was presented without substantial delay.

9

Despite these concessions, Respondent argues habeas relief is unavailable because Deturk's criminal history would not have changed the outcome of the case. This is so, Respondent argues, because the only possible favorable result would have been to prove Deturk was the aggressor in the altercation with Harris, but the jury already accepted this fact as true even without the new evidence and convicted Harris anyway.

## DISCUSSION

Harris contends that evidence of Deturk's out-of-state convictions constitutes "new evidence" within the meaning of section 1437, subdivision (b), and entitles him to habeas relief. We agree.

### A.    Legal Principles

A person unlawfully imprisoned may prosecute a writ of habeas corpus to inquire into the cause of the imprisonment. (§ 1473, subd. (a).) Habeas corpus will lie to vindicate a claim that new evidence more likely than not would have changed the outcome of the prisoner's trial. (§ 1473, subd. (b).)

Section 1473 defines "new evidence" as "evidence that has not previously been presented and heard at trial and has been discovered after trial." (§ 1473, subd. (b)(1)(C)(ii).)

Habeas relief is available if the petitioner proves, by a preponderance of the evidence, that the new evidence "is presented without substantial delay, is admissible, and is sufficiently material and credible that it more likely than not would have changed the outcome of the case." (§ 1473, subd. (b)(1)(C)(i).)

10

A changed trial outcome means a result different from the guilty verdict, including not only an acquittal but also a hung jury.  (*In re Sagin* (2019) 39 Cal.App.5th 570, 579.)  Harris's burden in this habeas corpus proceeding is thus to show it is more likely than not the evidence regarding Deturk's convictions would have led at least one juror to maintain a reasonable doubt of guilt.

The bar used to be considerably higher for a petition of this nature, in two respects.  First, before 2016, a habeas corpus petitioner alleging new evidence had to show the evidence pointed " 'unerringly to innocence' " and "undermine[d] the entire case of the prosecution."  (*In re Hall* (1981) 30 Cal.3d 408, 423.)  That standard required a petitioner to conclusively establish innocence.  (*Ibid*.)  Habeas corpus relief was thus reserved for those cases where newly discovered evidence essentially on its own proved a petitioner did not commit the crime.  In 2016, the Legislature amended section 1473 to provide for habeas corpus relief when new evidence more likely than not would have changed the trial outcome.  A petitioner no longer had to prove innocence but could simply show that the new evidence—viewed in relation to the evidence actually presented at trial—raised a reasonable doubt as to guilt.

Section 1473 thus "creates a sliding scale: in a case where the evidence of guilt presented at trial was overwhelming, only the most compelling new evidence will provide a basis for habeas corpus relief; on the other hand, if the trial was close, the new evidence need not point so conclusively to innocence to tip the scales in favor of the petitioner." (*In re Sagin*, *supra*, 39 Cal.App.5th at pp. 579-580.)

11

The Legislature lowered the bar a second time in 2024 when it amended section 1473 to define "new evidence" as "evidence that has not previously been presented and heard at trial and has been discovered after trial."  Before the amendment, "new evidence" was defined as "evidence that has been discovered after trial, that *could not have been discovered prior to trial by the exercise of due diligence*, and is admissible and *not merely cumulative, corroborative, collateral, or impeaching*."  (Former § 1473, subd. (b)(3)(B), italics added; see *In re Hardy* (2007) 41 Cal.4th 977, 1016 [under former standard, petitioner must show the evidence was not reasonably available to him prior to trial "had [he] conducted a reasonably thorough pretrial investigation"].)  The new standard both broadened the cognizable scope of new evidence and relieved a petitioner of the burden of establishing due diligence in obtaining the evidence; the petitioner need only prove the evidence was discovered after trial.

These changes in the law "represent[] an overall lower tolerance for wrongful convictions.  The Legislature has chosen to more closely protect society's interest in ensuring that a person convicted of a crime is the person who committed it."  (*In re Sagin*, *supra*, 39 Cal.App.5th at p. 580.)

**B.    Application**
    **1.    New Evidence**
We accept Respondent's concession that Yen's declaration presents admissible new evidence within the meaning of Penal Code section 1473 that Deturk possessed a more significant criminal history than the sexual battery conviction that was known at trial.  At the time of trial, neither the prosecution nor

12

the defense knew that Deturk had six additional convictions: four misdemeanor battery convictions and one felony and one misdemeanor conviction for resisting law enforcement. The battery convictions are relevant to show Deturk's conduct in conformity with a violent character. (See Evid. Code, § 1103, subd. (a) [evidence of specific instances of conduct of the victim of a crime admissible prove conduct of the victim in conformity with the character or trait of character suggested by the conduct].) This evidence was not presented and heard at trial but was discovered only after trial. (Pen. Code, § 1473, subd. (b)(1)(C)(ii).)

We conclude, and Respondent does not contest, that Yen's declaration is credible and was presented without substantial delay. Yen lays out the sequence of her investigation and supports her declaration with pertinent certified court records and references to websites where her results may be independently verified. Yen filed her declaration in January 2024, only one and a half years after Harris was sentenced.

### 2. Entitlement to Habeas Relief

The only disputed issue is whether the new evidence warrants habeas relief. We believe it does.

In closing argument, the prosecutor stated, "[T]he evidence does not support the defense claim that Curtis was violent that night," and argued, "[McKenney] described [Deturk] as having a good nature and being pleasant. I asked if he was erratic that night, and McKenney said no. I asked if [Deturk] was violent that night, McKenney said no."

Given the guilty verdict on the charge of voluntary manslaughter, it is apparent that the primary issue for the jury was whether Harris acted in either reasonable or unreasonable,

13

i.e., imperfect, self-defense. The elements of imperfect self-defense are that the defendant actually believed he was in imminent danger of being killed or suffering great bodily injury and actually believed that the immediate use of deadly force was necessary to defend against the danger, but at least one of those beliefs was unreasonable. (*People v. Thomas* (2023) 14 Cal.5th 327, 386.)

Evidence of Deturk's convictions for violent crimes would have bolstered Harris's and Cole's accounts of the confrontation between Deturk and Harris and impeached McKenney's testimony that Deturk was peaceful and good natured and did not raise his guitar to hit Harris. This was apparently a close question for the jury, as it requested a readback of McKenney's testimony on this point. (See *People v. Thompkins* (1987) 195 Cal.App.3d 244, 251-252 [request for readback shows close case].) Deturk's convictions would have supported Harris's claim that he was in imminent danger of suffering great bodily injury and had to use deadly force to defend himself. It is obviously more believable that a man with five convictions for violent crimes would aggressively charge towards another man than that a "good natured" man with no history of violence would do so.

Respondent argues that the evidence is immaterial because it would have tended to show only that Deturk was the aggressor, which the jury already accepted without the additional evidence, as indicated by the not-guilty verdict on the murder charge.

But in distinguishing among voluntary and involuntary manslaughter and full acquittal, the issue is not whether Deturk was the aggressor but nature of Deturk's aggression and the reasonableness of Harris's conduct in defending against it. There were two versions of Deturk's conduct: McKenney testified that

14

Deturk made no threatening gestures toward Harris, and Cole and Harris testified that Deturk raised his guitar over his head like a baseball bat and lunged toward Harris. Evidence that Deturk had been convicted multiple times for violent offenses would have undermined McKenney's account and lent credibility to the accounts of Harris and Cole.

Relying on *People v. Bates* (2019) 35 Cal.App.5th 1 (*Bates*), Respondent argues that "[e]vidence that a victim had previously threatened or harmed others is relevant to a defendant's claim of self-defense *only if* the defendant knew of the victim's prior threatening conduct." (*Id*. at pp. 9-10.)

*Bates* is distinguishable. There, the defendant shot the victim with no apparent provocation, and at trial claimed he acted in self-defense. There was evidence that the victim had twice threatened others with firearms some time before the shooting, but no evidence showed that the victim had threatened the defendant, or that the defendant knew the victim had previously threatened others. (*Bates*, *supra*, 35 Cal.App.5th at p. 10.) The defendant claimed he was entitled to an instruction that whether his conduct and beliefs were reasonable depended on whether the victim had threatened or harmed others in the past. (*Id*. at p. 6.) The court rejected the claim, holding, "the *reasonableness* of a defendant's beliefs is necessarily determined by what he is aware of, *not* from circumstances entirely unknown to him." (*Id*. at p. 10.)

Here, Harris's self-defense theory was predicated not on his knowledge of Deturk's prior convictions but on Deturk's conduct. Evidence of Deturk's convictions would have lent credibility to Harris's and Cole's description of Deturk's threatening conduct during the confrontation. (See *People v. Wright* (1985) 39 Cal.3d

15

576, 587 ["where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible"; "such character traits can be shown by evidence of specific acts of the victim on third persons"].)  "The admissibility of evidence to show a *victim's* conformity with a violent character is an entirely different issue from whether a *defendant's* conduct or belief was reasonable when the defendant had no knowledge of the victim's violent character.  While the former focuses on the victim's conduct, the latter focuses on the defendant's state of mind." (*Bates*, *supra*, 35 Cal.App.5th at p. 11.)

This was a close case, as evidenced by the jury acquitting Harris of murder and requesting a readback of key prosecution witness testimony.  (See e.g. *People v. Epps* (1981) 122 Cal.App.3d 691, 698 [refusal to convict on all charges shows a close case]; *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 [request for a readback shows a close case].)  Upon review both of the evidence presented at trial and the new evidence pertaining to Deturk's criminal history, we conclude Harris has proved by a preponderance of the evidence that evidence of Deturk's convictions for crimes of violence more likely than not would have changed the outcome of the trial.  Accordingly, we grant habeas relief.

We need not reach the issues whether the prosecution committed a *Brady* violation or Harris's defense counsel rendered ineffective assistance.

### DISPOSITION

The petition for writ of habeas corpus is granted insofar as it is based upon newly discovered evidence, and the judgment of the Los Angeles County Superior Court in People v. River Harris,

16

No. LA093615, is therefore vacated.  Upon finality of our opinion, the Clerk of the Court of Appeal shall remit a certified copy of the opinion and order to the Los Angeles County Superior Court for filing, and respondent Attorney General shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (a)(2).  (See *In re Lucas* (2004) 33 Cal.4th 682, 737.)  The order to show cause is discharged.

The People remain free to retry petitioner.  If the People elect to retry Harris, the People may not retry Harris for any crime greater than voluntary manslaughter.  The People retain the discretion to charge any applicable enhancements or aggravating factors.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.