[No. D004823. Fourth Dist., Div. One. Sept. 30, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
RUFUS THOMPKINS, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1 and 976(b), this opinion is certified for publication with the exception of section II B.

**COUNSEL**

Richard P. Siref, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Frederick R. Millar, Jr., and Yvonne H. Behart, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WIENER, Acting P. J.**—In this appeal from a judgment of conviction on charges of first degree murder, attempted murder and burglary, we consider

the effect of a trial judge's response to inquiries from the jury regarding the defendant's heat-of-passion defense, the central issue in the case, after the jury had announced itself deadlocked. While it is true his one- and two-word comments had the desired effect of breaking the deadlock, the judge's "guidance" was legally incorrect and, as we shall explain, constituted prejudicial error. Accordingly, we must reverse the judgment as to the murder and attempted murder counts.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Rufus Thompkins and the murder victim, Erma Thompkins, had been married 16 years when Erma decided she wanted a divorce in 1985.[2] The couple separated in November of that year. Although Rufus spent Christmas with the family, the separation was not totally cordial. Upset by the breakup, Rufus continually phoned Erma and often parked outside the apartment complex waiting for her or one of the children. Erma obtained a restraining order preventing Rufus from entering her apartment, although she later allowed the restraining order to lapse.

Less than two weeks before the killing, Rufus spoke with Randy Hampton, a good friend who was married to Erma's sister. Rufus confided to Hampton about his strong feelings for Erma and how much the separation was bothering him. He explained he had been following Erma and thought she was seeing someone else. He wanted to convince this person to stop seeing her. If this proved unsuccessful, Rufus thought he would have to "take him out" and her as well. Hampton tried to dissuade him, pointing out the effects on his children and grandchild but Rufus persisted, saying he was willing to "do seven years for taking them out."

On January 29, 1986, Erma's boyfriend, Willie Battle, was visiting Erma at her apartment. Also at home was 12-year-old Ray Thompkins, Rufus's and Erma's son, who was babysitting his year-old niece. Rufus had told Ray about two weeks earlier that he knew Erma was seeing Battle. When Ray answered his father's knock at the door that morning, Rufus told him he had come to exchange a small television set for a larger one of his which was still at the apartment. Concerned because Battle was inside with Erma, Ray stepped outside to talk to his father.

In response to Rufus's inquiries, Ray told him that Battle was inside with his mother. Ray went back into the apartment and told Rufus to wait at the front door. Instead, Rufus followed Ray to the closed door of his mother's

---

[2] Because we are dealing with a husband and wife as defendant and victim, we depart from our usual practice and refer to each by their first name.

bedroom. Ray said, "Mom, Dad's here." Rufus pushed Ray aside, opened the door and discovered Erma and Battle in bed together. Erma was hurriedly putting some clothes on. Rufus went inside and closed the door.

Erma told Rufus he had no right to barge in on her like that. Rufus said something to Battle about being in bed with his wife. Battle replied he thought they were separated. Rufus's hands were shaking. Battle started to get up. Rufus pulled a gun from his waistband, pulled back the hammer and fired one shot at Erma. As Erma fell, he turned and shot Battle, then turned again and fired a second shot at Erma. He then fled from the apartment. Erma died of a gunshot wound to the heart. Battle recovered but suffered some permanent nerve damage to his arm.

Approximately 50 minutes later and about a quarter mile from Erma's apartment, Rufus flagged down a police car and turned himself in. Rufus's car was discovered still parked at the apartment in a parking space next to Willie Battle's car. A search yielded two suitcases packed with clothes and various other personal belongings. The gun was never found.

A San Diego Gas and Electric Company employee who was working at the apartment complex on the morning of August 29 testified that at approximately 11 a.m. he heard a boy screaming and saw a Black man wearing a short-sleeved white shirt run from the complex and scale a concrete wall. About a half hour earlier, this same gas company employee had seen a Black man "hanging out" around the complex. He assumed it was the same man because he also was wearing a short-sleeved white shirt.

Rufus testified that when he arrived at Erma's apartment to exchange television sets, he did not know Willie Battle was there although he knew Erma had been seeing Battle. He did not come to the apartment intending to kill anyone. He was only exchanging television sets because he had decided to accept his cousin's offer to come stay with him in Pasadena. He brought his gun with him because Erma had a gun and had previously made threats against him.

When Ray let him into the apartment, Rufus told him to tell Erma he was there. He then followed Ray down the hallway and heard the sounds of lovemaking coming from Erma's bedroom. Rufus became upset and began crying. He pushed Ray aside, opened the door and confronted Erma and Battle. Rufus asked Battle if he knew Erma was his wife. Battle replied he thought they were separated. Erma was complaining that Rufus had no right to barge in on her like that. Rufus told her he didn't barge in, Ray let him in. Rufus then stepped back toward the bedroom door and started to wipe his eyes. As he did so, he saw Battle make a quick move which he

interpreted as Battle reaching for a gun under the mattress. At the same time, Erma reached for a jewelry box on the dresser. Rufus testified, "My emotions just took over at that point. And I just went off at that point. . . . I shot Mr. Battles [*sic*]. And then I shot my wife."

Rufus admitted shooting Erma twice after he shot Battle. He then panicked and fled from the apartment, leaving his car behind. While running along North River Road a short distance from the apartment, Rufus lost the gun. He looked back and saw three Latin-looking individuals who appeared to have retrieved it. When he later returned with police to look for the gun, it was gone. Rufus denied knowing that Willie Battle had a car or what it looked like. He also denied being at the apartment complex a half-hour before the shootings.

DISCUSSION

I

At least as early as *Manning's Case* (1793) 83 Eng. Rep. 112,[3] an archtypical illustration of adequate provocation sufficient to invoke the common law heat-of-passion theory for voluntary manslaughter has been the defendant's discovery of his wife in bed with another man. Not surprisingly, then, Rufus's principal theory of defense to the charge of first degree murder attempted to cast him as the emotionally distraught husband unexpectedly confronted with the reality of his wife's adultery. In contrast, the prosecution's case emphasized the events preceding the shootings which would tend to portray Rufus as having premeditated the killing of Erma Thompkins and Willie Battle.

 During the second day of deliberations, the jury notified the court that it was deadlocked and that there was no reasonable probability it could reach a unanimous verdict. The court inquired whether there was anything it could do to assist the jury. The foreperson suggested that "a little clarification from you about one aspect of the law might be helpful to us." The judge then directed the jurors to return to the jury room and formulate their questions in writing. When they returned to the courtroom, the judge stated as follows: "Okay. Well, I will now read your question and try to answer it, as to Count 1. And then I will send you back to deliberate further.

---

[3] The case is reported as follows: "John Manning was indicted in Surrey for murder, for the killing of a man. And upon not guilty pleaded, the jury at the Assizes find that the said Manning found the person killed committing adultery with his wife in the very act, and flung a jointed stool at him, and with the same killed him; and resolved by the whole Court, that this was but manslaughter; and Manning had his clergy at the Bar, and was burned in the hand; and the Court directed the executioner to burn him gently, because there could not be greater provocation than this."

"All right. May 21, 1986, the clarification of CALJIC 8.20, how does premeditation and sudden heat of passion interrelate in this law, CALJIC 8.20[?] It doesn't.

"Can sudden heat of passion nullify premeditation, also in this law[?] No.

"So with that added information, please continue your deliberations. . . ." These statements constituted the judge's entire response to the jury's request for assistance.

The trial judge's instructions to the jury have always been recognized to be a fundamentally important stage of the criminal proceeding. (See, e.g., *People* v. *Dagnino* (1978) 80 Cal.App.3d 981, 988 [146 Cal.Rptr. 129].) Indeed, one can legitimately argue that the primary function of the judge in a jury trial is to explain the applicable legal principles in such a way as to focus and define the factual issues which the jury must resolve. In this role, the trial judge acts much like a teacher or a guide; it is no accident that we refer to the trial court's obligation to "instruct" the jury on the applicable law. It is not sufficient that the trial judge be an adequate legal lecturer. Jurors are not first year law students with some independent motive for legal study. At best, they are well meaning but temporary visitors in a foreign country attempting to comprehend a foreign language.

To perform their job properly and fairly, jurors must *understand* the legal principles they are charged with applying. It is the trial judge's function to facilitate such an understanding by any available means. The mere recitation of technically correct but arcane legal precepts does precious little to insure that jurors can apply the law to a given set of facts. A jury's request for reinstruction or clarification should alert the trial judge that the jury has focused on what it believes are the critical issues in the case. The judge must give these inquiries serious consideration. Why has the jury focused on this issue? Does it indicate the jurors by-and-large understand the applicable law or perhaps it suggests a source of confusion? If confusion is indicated, is it simply unfamiliarity with legal terms or is it more basically a misunderstanding of an important legal concept?

The juror inquiries in this case focused on the relationship between the heat-of-passion doctrine and the element of premeditation necessary for a first degree murder conviction. We admit to some difficulty understanding exactly what the jury was asking. If the trial judge shared our confusion, it may be he should have begun by asking the jury to clarify their questions.

Assuming the questions were clear, the succinct response given by the trial judge certainly has the virtue of simplicity, not an unimportant

consideration in formulating instructions to a jury of laypersons. ██ ██
██ ██ The response, however, was inadequate. The answer suggests the
court failed to consider what was motivating the jury's questions.[4] ██We
can conceive of at least two points of possible confusion. First, the jury was
instructed there is no minimum amount of time necessary for a defendant to
premeditate an intentional killing. (See CALJIC No. 8.20 (4th ed. 1979).)
Here, the evidence showed that some period of time passed between Rufus's
entry of Erma's bedroom and the fatal shots. Some jurors may have been
seeking clarification on whether a premeditated intent to kill formed as a
result of adequate provocation justified a verdict of first degree murder. On
the other hand, and we suspect more likely, the jury may have been seeking
guidance on whether a defendant who encounters objectively adequate
provocation but has already formed the premeditated intent to kill before
the provocation is nonetheless guilty of first degree murder.

In any event, the trial judge's response that there is no relationship
between heat of passion and premeditation was in error. The two concepts
are related in that they are mutually exclusive. As the Supreme Court
explained in *People* v. *Sanchez* (1864) 24 Cal. 17, 30 "The intent to kill . . .
must be formed upon a pre-existing reflection, and not upon a sudden heat
of passion sufficient to preclude the idea of deliberation." This discussion
continues to form the basis for the standard CALJIC instruction on the
subject.[5] In response to the jury's inquiry, the judge should have addressed
himself to this relationship, explaining why the two concepts cannot coexist
concurrently and articulating the standard for determining which concept is
applicable in a given situation. In this context, the judge may have been
advised to reread and amplify on CALJIC No. 8.20.

The People argue that any error in the trial judge's answers to the jury's
questions was not prejudicial in view of the strong evidence demonstrating
premeditation. A simple answer to this contention is that the jury was .

---

[4]The trial judge received the jury's written inquiry at 2 p.m. on the final day of delibera-
tions. After a five-minute chambers conference with counsel which was not reported, the
judge responded to the inquiry at 2:11 p.m. Although we have no way of knowing what went
on during the five-minute meeting, the entire eleven-minute interval does not suggest an ex-
haustive study of the legal issue presented by the jury's questions. Of course, trial counsel's
failure to object to an error in jury instructions does not preclude a defendant from raising
the issue on appeal. (Pen. Code, § 1259; *People* v. *Harris* (1981) 28 Cal.3d 935, 956 [171
Cal.Rptr. 679, 623 P.2d 240].) We cannot interpret a silent record including an unreported
chambers conference to indicate anything other than trial counsel's failure to object to the
judge's instructions.

[5]CALJIC No. 8.20 (4th ed. 1979) reads in relevant part as follows: "If you find that the
killing was preceded and accompanied by a clear, deliberate intent on the part of the defend-
ant to kill, which was the result of deliberation and premeditation, so that it must have been
formed upon pre-existing reflection and not under a sudden heat of passion or other condi-
tion precluding deliberation, it is murder of the first degree."

deadlocked prior to the judge's statement; necessarily, at least one of the jurors was not persuaded by the strength of the prosecution's evidence. (See *People* v. *Markus* (1978) 82 Cal.App.3d 477, 482 [147 Cal.Rptr. 151].) Furthermore, even the prosecution's evidence was not completely consistent with a premeditation theory. If Rufus went to Erma's apartment intending to kill both her and Battle, why would he flee the scene on foot leaving his car packed with personal belongings in the parking lot?

■ We have also considered whether the jury's finding Rufus guilty of burglary necessarily indicates it also would have found premeditation under correct instructions. (Cf. *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) To the contrary, however, a verdict of guilty on the burglary charge required only that the jury determine Rufus entered the apartment with the intent to commit *some* felony. Under the court's instructions, that felony could be either murder, attempted murder *or* assault with a deadly weapon. One possible view of the evidence is that Rufus entered the apartment intending only to threaten Erma and Willie Battle—hence making him guilty of burglary—but only formed the intent to kill when he was provoked by the sight of Erma and Battle in bed together. Much if not all of the prosecution's "overwhelming" evidence of premeditation is as consistent with a premeditated intent to assault as it is with a premeditated intent to kill.

Accordingly, we must reverse. Although the erroneous instruction focused only on the murder count, the heat-of-passion theory operates to eliminate the malice necessary to establish the attempted murder charge as well. We therefore reverse Rufus's convictions on both the murder and the attempted murder counts.

We pause at this juncture to express concern lest this opinion be interpreted as a bad case of appellate pontification induced by a virulent strain of ivory towerism. Each member of this panel has served as a superior court judge and we are sensitive to the significant burdens of that office. We are aware that while a jury is deliberating, a trial judge is occupied with numerous other important tasks. It is rarely convenient to "drop everything" to respond to juror questions, especially if the response requires supplemental research on a question of law.

But from our appellate perspective, of the many and varied contentions of trial court error we are asked to review, nothing results in more cases of reversible error than mistakes in jury instructions. And if jury instructions are important in general, there is no category of instructional error more

prejudicial than when the trial judge makes a mistake in responding to a jury's inquiry during deliberations. We recognize that formulating a response to such questions often requires consultation with counsel and significant independent legal research. In purely cost-benefit terms, however, a trial judge should view any such effort as time well spent.

Although we strongly counsel against the type of peremptory response used in this case, neither do we mean to advocate that a trial judge never stray from the language of form instructions. It is hardly preferable for a judge to merely repeat for a jury the text of an instruction it has already indicated it doesn't understand. We are convinced both jurors and the justice system will be well served in the vast majority of cases if the trial judge thoughtfully considers the jury's inquiry, clarifies it if necessary, studies the applicable legal principles, and responds to the jury in as simple and direct a manner as possible.

## II

### A

During cross-examination of Rufus, the prosecutor asked the following questions:

"Q. Incidentally, I notice that you have a brace on today. There is nothing wrong with your legs; is there?

"A. No, there is not.

"Q. So you had no problems climbing the wall [near Erma's apartment] that day? This brace is just for security purposes; is that right?" Defense counsel objected to the prosecutor's questioning, calling it "highly improper." The court sustained the objection. Defense counsel then moved for a mistrial. The prosecutor responded as follows: "If this ever goes up for appeal, I think it should be noted for the record, in North County here in San Diego, this man who is in custody and I understand it is done in all what is considered serious felonies, he has a leg brace on his leg that is visible and can be heard when he moves across the room.

"It is visible to anyone that would look at him. And as a matter of fact, he has a noticeable limp, as I suppose any person would have, if they had to wear that type of a brace on their leg. It was my concern that with the discussion concerning his safety, he stated that he was afraid of his wife. And his statements about leaving the area, about going to another area, that the jurors could infer that in fact the man had polio, was partially crippled.

"I felt I had to bring it up, the fact he didn't have this leg brace on. There was nothing wrong with his leg on that day. I, in no way, intended to, in any way, prejudice the jury against him. And quite frankly, I think realistically, it's been my experience in the years that I've prosecuted cases, that most jurors expect defendants that are charged with serious crimes, such as murder, rape or any type of assaultive behavior, to be in custody.

"I don't think that prejudices them one way or the other." The trial judge denied the mistrial motion but admonished the jury that the "leg brace is there as a security measure. I point that out to you only because it has absolutely no bearing, none whatsoever, not to be considered by you in determining the defendant's guilt or innocence."

Rufus correctly points out that the routine shackling of defendants is a practice long condemned by the California Supreme Court. (See, e.g., *People* v. *Harrington* (1871) 42 Cal. 165, 168; *People* v. *Kimball* (1936) 5 Cal.2d 608, 611 [55 P.2d 483]; *People* v. *Ross* (1967) 67 Cal.2d 64, 72 [60 Cal.Rptr. 254, 429 P.2d 606], revd. on other grounds, *Ross* v. *California* (1968) 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850]; *People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) In its most recent discussion of the issue, the Supreme Court in *Duran* held, "[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (16 Cal.3d at pp. 290-291.) In *Duran*, the defendant was a state prison inmate previously convicted of robbery who was charged with a violent crime, i.e., assault with a deadly weapon. These facts "did not, without more, justify the use of physical restraints. . . . [T]he trial judge must make the decision to use physical restraints on a case-by-case basis. The court cannot adopt a general policy of imposing such restraints upon prison inmates charged with new offenses unless there is a showing of necessity on the record." (*Id.* at p. 293.) Thus, if the prosecutor was correct in stating that physical restraints are used as a matter of course on all serious felony defendants in the North County Branch of the San Diego Superior Court, such a policy manifestly violates *Duran* and should be discontinued.

In the present case, however, Rufus is precluded from contesting the use of physical restraints because his counsel failed to object in a timely fashion. (See *People* v. *Chacon* (1968) 69 Cal.2d 765, 778 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454].) Instead, he complains the prosecutor committed misconduct by questioning him about the restraints, emphasizing and exacerbating the prejudicial effect.

The prosecutor attempted to justify her questions by suggesting that the jury might have assumed Rufus was afflicted with polio or a similar

debilitating condition. Such an assumption, it is theorized, might have impeached the credibility of the prosecution witness who testified he saw Rufus scale a concrete wall while fleeing from the apartment complex or bolstered Rufus's testimony that he felt threatened by Erma. We view the prosecutor's expressed concerns as speculative at best. Rufus himself admitted scaling the wall after the shootings. And Erma's threats were in no sense based on Rufus's physical vulnerability but were specifically tied to her experience with firearms and her possession of a .22 caliber handgun. One needn't be a polio victim to feel threatened by a firearm-wielding assailant. In view of the Supreme Court's unequivocal statements in *Duran,* if the prosecutor entertained serious concerns that the leg brace might be misinterpreted by the jury to the detriment of the People's case, she should have raised the issue with the court and defense counsel out of the presence of the jury.

We cannot conclude, however, that the prosecutor's error requires reversal. Here, it appears from the prosecutor's statements that the leg brace worn by Rufus was visible and obvious. Rufus having failed to object, we must presume the leg restraints were necessary. *Duran* specifies that where visible restraints are necessary, the trial court is obligated to "instruct the jury *sua sponte* that such restraints should have no bearing on the determination of the defendant's guilt." (16 Cal.3d at pp. 291-292.) Thus, the court would have been obliged to give a cautionary instruction even in the absence of the prosecutor's questions and those questions did not convey to the jury any information which would not have been contained in the court's required sua sponte instruction. The prosecutor's error was harmless beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; cf. *People* v. *Taylor* (1982) 31 Cal.3d 488, 499-500 [183 Cal.Rptr. 64, 645 P.2d 115]) and the trial court was not obliged to grant a mistrial.

B.*

· · · · · · · · · · · · · · · · · · · · · ·

III

In view of our dispositive conclusions, we comment only briefly on two of Rufus's remaining contentions. During discussions with the court regarding jury instructions, defense counsel expressly waived the giving of an instruction on attempted voluntary manslaughter—a lesser included offense of

---

*See footnote 1, *ante,* page 244.

attempted murder—as a matter of trial tactics. Accordingly, as to the count relating to the shooting of Willie Battle, the jury was instructed only on the offense of attempted murder and the lesser related offense of assault with a firearm (Pen. Code, § 245, subd. (a)(2)). This was error. ■ "The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 716.) On retrial, the jury should be instructed on the crime of attempted voluntary manslaughter.[6]

Defense counsel offered three special instructions relating to particulars of Rufus's heat-of-passion defense.[7] The trial court refused to give them on the grounds they constituted incomplete statements of the applicable law and were duplicative of standard CALJIC instructions. We sympathize with the burden sua sponte instructional requirements create for trial courts. Where defense counsel drafts "pinpoint" instructions which focus on issues highlighted by the theory of defense, however, the burden on the trial court is minimal. It consists primarily of understanding the relevant legal principles well enough to determine whether the proffered instructions constitute accurate statements of law. In this regard, we assume prosecutors will always be available to alert the court to any inaccuracies in the defense offerings.

■ Here the trial court refused the instructions because they were allegedly incomplete and duplicated standard CALJIC instructions. It is unclear whether defense counsel intended that his suggested instructions supple-

---

[6] Although his argument on this point is captioned as being applicable to both the attempted murder *and* burglary charges, Rufus's reply brief appears to concede that resolution of the burglary count hinges on whether the jury believed he entered Erma's apartment with the intent to commit a felony (i.e., murder or assault). The heat-of-passion concept has no bearing on that issue since the alleged provocation occurred while he was inside. The verdict of guilty on the burglary charge necessarily indicates the jury believed Rufus had some felonious intent when he entered the apartment. We have no way of knowing whether the jury concluded Rufus formed the *intent to kill* before opening the door to Erma's bedroom.

[7] Defendant's requested instruction E read as follows: "The passion necessary to constitute heat of passion need not mean rage or anger but may be any violent, intense, overwrought or enthusiastic emotion which causes a person to act rashly and without deliberation and reflection."

Defendant's requested instruction F read as follows: "No specific type of provocation is required to generate the passion necessary to constitute heat of passion, and verbal provocation may be sufficient."

Defendant's requested instruction G read as follows: "A defendant may act in the heat of passion at the time of killing as a result of a series of events which occur over a considerable period of time. [¶] Where the provocation extends for a long period of time, you must take such period of time into account in determining whether there was a sufficient cooling period for the passion to subside. [¶] The burden is on the prosecution to establish beyond a reasonable doubt that the defendant did not act in the heat of passion."

ment or supplant the CALJIC fare. For the purposes of retrial, it is sufficient for us to note that these reasons are insufficient if the defendant offers "pinpoint" instructions intended to supplement or amplify more general instructions. Excessively duplicative language can always be stricken. In these circumstances, the defendant is entitled to instructions which direct attention to evidence or amplify legal principles from which the jury may conclude that his guilt has not been established beyond a reasonable doubt. (See, e.g., *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Hall* (1980) 28 Cal.3d 143, 159 [167 Cal.Rptr. 844, 616 P.2d 826]; *People* v. *Harvey* (1984) 163 Cal.App.3d 90, 112-113 [208 Cal.Rptr. 910].) From our review of this record, Rufus would appear to have been entitled to his instructions E, F and G, which constitute accurate statements of the law as applied to the facts of the case. (See *People* v. *Borchers* (1958) 50 Cal.2d 321, 328-329 [325 P.2d 97]; *People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777].)

## DISPOSITION

As to count one (murder) and count two (attempted murder), the judgment is reversed. As to count three (burglary), the judgment is affirmed.

Work, J., and Benke, J., concurred.