Filed 6/24/25  P. v. Vigil CA1/5
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT
DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>DAVID RICHARD VIGIL,<br><br>  Defendant and Appellant. | A164977<br><br>(Alameda County<br>Super. Ct. No. 178803) |

In September 2015, defendant and appellant David Richard Vigil (appellant) fired 13 bullets into a parked vehicle at close range, killing the driver and passenger.  As to the driver, a jury convicted appellant of voluntary manslaughter on a heat of passion theory (Pen. Code, § 192, subd. (a)).[1]  As to the passenger, the jury convicted appellant of second degree murder (§ 187, subd. (a)).  The jury also convicted appellant of shooting at an occupied vehicle (§ 246).

On appeal, appellant contends a number of errors at trial prejudicially undermined his self-defense claim.  We conclude the trial court prejudicially erred in answering a question from the jury, and, as a result, we reverse appellant's convictions for voluntary manslaughter and shooting at an occupied vehicle.  But we reject appellant's contention that the absence of an instruction on transferred intent mandates reversal of his conviction for

---

[1] All undesignated statutory references are to the Penal Code.

murder of the passenger.  We do remand for resentencing on the murder conviction, for exercise of the trial court's discretion pursuant to the requirements of section 1385, subdivision (c), effective just months before the date of sentencing.

## PROCEDURAL BACKGROUND

In July 2016, the Alameda County District Attorney filed an information charging appellant with the murders of Jorge Salazar-Gonzalez (§ 187, subd. (a); count 1) and Edward Miranda-Castillo (§ 187, subd. (a); count 2), with firearm and great bodily injury (GBI) enhancement allegations. In December 2019, after the prosecution rested its case at trial, the district attorney filed a first amended information adding one count of shooting at an occupied motor vehicle (§ 246; count 3), with firearm and GBI enhancement allegations.

As to victim Salazar-Gonzalez (count one), the jury found appellant not guilty of second degree murder but guilty of voluntary manslaughter under a heat of passion theory, and it found true that he used a firearm in the commission of the crime (§ 12022.5, subd. (a)).  As to victim Miranda-Castillo (count two), the jury found appellant guilty of second degree murder, and it found true that he personally and intentionally discharged a firearm causing GBI and death (§§ 12022.7, subd. (a), 12022.53. subd. (d)), that he personally inflicted GBI (§ 12022.7), and that he personally used and discharged a firearm (§ 12022.53, subds. (b) & (c); 12022.5, subd. (a)).  The jury also found appellant guilty of shooting at an occupied vehicle (count three), and it found true that he personally and intentionally discharged a firearm causing GBI and death (§ 12022.53, subd. (d)).

In April 2022, the trial court denied appellant's motion for a new trial and sentenced him to 30 years to life in prison.  The sentence consisted of 30

2

years to life on count three and the associated firearm enhancement, and stayed terms on counts one and two and the associated enhancements.

The present appeal followed.[2]

## FACTUAL BACKGROUND

At trial, it was undisputed that appellant shot and killed two men, Salazar-Gonzalez and Miranda-Castillo, while they sat in a parked car on a street in Oakland late at night on September 24, 2015. Victim Salazar-Gonzalez shot and wounded appellant during the incident, and the principal contested issue at trial was whether appellant acted in self-defense.

The Shooting

The victims worked together at an Oakland pizzeria, and they often socialized with a coworker, José C. José C. lived on Crosby Avenue in Oakland, and he rented a room to Miranda-Castillo. On the night of the shooting, the three men planned to share pizza at José C.'s house after work. José C. was asleep when the victims texted that they were outside his home, but he awoke to gunshots at 11:26 p.m. He checked his home surveillance cameras and saw a car drive by his home and shoot at the victims.

On September 24, 2015, at about 11:45 p.m., the Oakland police received a "ShotSpotter" notification that shots had been fired on Crosby Avenue in Oakland. The reporting officers found two deceased men—later identified as Salazar-Gonzalez and Miranda-Castillo—in a parked car that was riddled with bullet holes. The driver's side, where Salazar-Gonzalez sat, had multiple bullet holes, and the rear window had been "shot out." Miranda-Castillo was in the front passenger seat. Both men had multiple

---

[2] This court filed an opinion in this matter on September 29, 2023, but we subsequently granted rehearing, vacated the opinion, appointed new counsel for appellant, and set a new briefing schedule.

3

gunshot wounds to their upper bodies. There was a .40-caliber handgun with the "slide locked to the rear" in Salazar-Gonzalez's lap.

Shortly after midnight, the police learned there was another gunshot victim at Kaiser Hospital in Oakland, who turned out to be appellant. Police officers went to the hospital and spoke with appellant and his cousin, Antonio S. Appellant told the officer he was shot by an unknown person near Bancroft Avenue in Oakland, while urinating. Antonio S. made a consistent statement. There was no ShotSpotter activity in the area the men identified.

Antonio S. testified that, earlier on the evening of the shooting, appellant and his friend "Christian" had smoked marijuana at his home and then left. Later, appellant called and asked to be picked up. When Antonio S. arrived at appellant's home, appellant and Christian were there, and appellant asked Antonio S. to take him to the hospital because he had been shot. Antonio S. drove appellant to the hospital. In the car, appellant concocted the story about getting shot while urinating and told Antonio S. to repeat the story if asked. Antonio S. initially told the story to the police but later admitted it was a lie.

Police collected 14 casings from around the victims' parked car; one was a .40-caliber casing, and the other 13 were .45-caliber. A firearms expert testified that the 13 casings were fired from the same gun, a Glock pistol. The expert opined that the gun found in Salazar-Gonzalez's lap was jammed. Forensic pathologists testified that both Salazar-Gonzalez and Miranda-Castillo died of "multiple gunshot wounds."

Surveillance video admitted into evidence at trial showed that, on the night in question, appellant slowly drove past the victims' parked car, then reversed and pulled alongside the parked car for almost 30 seconds, then moved forward to allow another car to pass, and then reversed and parked

4

alongside the victims' car. Appellant and his companion exited the car, appellant approached the victims' vehicle on foot, and then appellant reached into the driver's window of the parked car. Immediately thereafter, appellant stepped back and repeatedly fired a gun into the parked car, as did his companion. Appellant continued firing as he backed away, and then appellant and his companion got back into their car and drove away.

Appellant's Testimony

Appellant testified that, on the evening of the shooting, he and his friend Christian went to his cousin Antonio S.'s house and smoked marijuana. After they left, Christian wanted to find more marijuana, and appellant suggested they try Crosby Avenue because he knew people sold drugs in that area. He acknowledged Crosby Avenue was a violent area of Oakland. Appellant carried an unregistered gun, which he knew was illegal. On Crosby Avenue, they saw the victims in a parked car, and appellant pulled up his car alongside the parked car. Appellant nodded his head towards the men in the parked car and the men nodded back, which appellant understood as permission to approach. Appellant asked, "Hey, what's up with you guys[?]" They responded, "What's up?" and appellant said he was looking for "weed." The man in the driver's seat of the parked car said, "Well, who the fuck are you?" Appellant gave his name and told the men he lived down the street, but, before they could talk further, appellant had to move his car to let another car by.

Appellant let the other car pass and then reversed and stopped alongside the parked car. Appellant got out of his car and approached. The man in the driver's seat seemed "real nervous"; he had his hand on his lap, and the hand was "creeping" towards his waist. Appellant stepped closer, touched the car, and the man's hand went underneath his shirt. Appellant

5

realized the man was grabbing something and said, "Hey, what do you got?" The man made a "jerk reaction" and pulled out a gun. Appellant reached in to grab the gun, but there was not enough time. The man was pointing the gun at appellant; appellant drew his gun and started firing because he believed his life was in danger. He was shot in the shoulder; he may have fired his gun before being shot.

Appellant shot into the parked car 13 times in total. He continued shooting through the back of the car as he ran to his own car. Christian, who had also gotten out of the car, also had a gun and fired at the parked car. They then got back into appellant's car and drove away. Appellant drove home and got his cousin to drive him to the hospital. At the hospital, and later at the police station, appellant lied and claimed he was shot near Bancroft Avenue.

## DISCUSSION

I.  *Appellant's Conviction for Voluntary Manslaughter Must Be Reversed*

Appellant contends his conviction for voluntary manslaughter must be reversed because the trial court erred in various ways in instructing the jury regarding his right to self-defense, including in response to a jury question. He also alleges prosecutorial misconduct, both as an independent basis for reversal and in support of his claim that he was prejudiced by the court's instructions to the jury. We conclude the trial court prejudicially erred in answering the jury's question about appellant's right to self-defense.

A.  *Summary of Relevant Proceedings Below*

The jury received various instructions relevant to the murder and voluntary manslaughter offenses, including instructions on self-defense, provocation and heat of passion, imperfect self-defense, contrivance, and initial aggressor. The initial aggressor instruction, "Right to Self-Defense:

6

Mutual Combat or Initial Aggressor" (CALCRIM No. 3471), was given as follows: "A person who starts a fight has a right to self-defense only if: [¶] l. He actually and in good faith tried to stop fighting; [¶] AND [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight." The trial court did *not* read a portion of the instruction regarding "sudden escalation," which provides, "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend [himself] with deadly force and was not required to try to stop fighting [or] communicate the desire to stop to the opponent [or] give the opponent a chance to stop fighting." (CALCRIM No. 3471.)

During his closing argument, the prosecutor argued that appellant could not claim self-defense because he was the aggressor in the interaction with the victims, repeatedly emphasizing that appellant's conduct prior to the shooting itself was aggressive and threatening due to the "context" and "circumstances." For example, the prosecutor argued that appellant "roll[ed] up on people he doesn't know at 11:30 at night in a neighborhood that isn't his own and he's armed and his buddy is armed, and he's saying he has the right of self-defense. The law doesn't say that. It doesn't say that." He argued, "You shouldn't get to say, Self-defense, I walked up with guns and because they reacted to me, I had to shoot them." He expressly connected the argument to the language in CALCRIM No. 3471, asserting, "If you're the initial aggressor, you create the scenario; right? You only get self-defense if you tried to stop this altercation and you communicate this fact. . . . You don't

7

get to start the drama and then say, Hey, I started it, but I had to finish it because, you know, it escalated. [¶] I walked up on them with a gun, but they had a gun. So I had to shoot them because they had a gun." In his rebuttal, he argued, "When you again create this scenario that leads to the shootout and everything you do is unreasonable that leads to it, you don't get to say, Hands clean."

During deliberations, the jury sent a note asking for "clarification of 'start a fight' as noted in Jury Instruction 3471." The note asked, "Can the initiated aggression referenced in 'start a fight' be a verbal altercation, nonverbal threatening, etc., prior to physical contact?" The court responded, "Yes, it can be a verbal altercation or nonverbal threatening conduct prior to physical contact." Defense counsel requested that the jury be provided with the "sudden escalation" portion of the instruction. Counsel argued that omitted portion of the instruction went "hand-in-hand" with the jury's question and would "help illuminate the concept" for the jury. The trial court denied the request.

An hour after the trial court answered the jury's question about CALCRIM No. 3471, the jury announced it had reached a verdict.[3]

B.    *Analysis*

Among other things, appellant contends the trial court's answer to the jury's question was in error because "start a fight" in the context of CALCRIM No. 3471 means to start a *physical* fight, while the court told the

---

[3] The briefs on appeal reference a letter the trial court received from the foreperson of the jury after the jury was discharged. Because the parties agree we cannot consider the letter as evidence of the jury's mental process (see Evid. Code, § 1150, subd. (a)), we do not address it herein.

The briefs also reference a motion for a new trial filed by appellant. We need not summarize those proceedings in order to resolve the present appeal.

8

jury that it could find appellant started a fight by a verbal altercation or nonverbal threatening conduct without physical contact.[4]  Appellant argues the court's response "caused the jury to incorrectly believe that [appellant] lost the right to defend himself, even if he initiated a verbal altercation or started a dispute without using force or the threat of force."  He further argues the likelihood of the jury so misunderstanding the law was heightened by the prosecutor's closing argument, in which he argued that appellant lost his right to defend himself because he "created the situation" that resulted in the shootings.

The parties *agree* the trial court's response to the jury's question was erroneous.[5]  Respondent states, "[W]e agree with appellant that starting a verbal argument would not implicate the limitations on self-defense articulated in CALCRIM No. 3471."  The concession is appropriate. CALCRIM No. 3471 charges the jury to make a "preliminary determination of whether the defendant had the right to use force" where he was the "initial aggressor."  (*People v. Johnson* (2009) 180 Cal.App.4th 702, 711, italics

---

[4] Appellant also argues that the trial court never should have given the instruction, and that, in any event, the court erred in failing to include the portion regarding sudden escalation.  We need not address those additional claims of error.  Neither need we address appellant's claim that the trial court erred in its instruction on contrived self-defense.

[5] Respondent argues appellant forfeited this claim because his counsel acquiesced in the trial court's response to the jury's question.  Because the error undermined proper consideration of appellant's self-defense claim, our review is not precluded by counsel's failure to object.  (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 949 (*Ramirez*) [no forfeiture because trial court's failure to properly instruct the jury on self-defense "affects the defendant's substantial rights"]; see also *People v. Hudson* (2006) 38 Cal.4th 1002, 1012 [rule of forfeiture "does not apply when, as here, the trial court gives an instruction that is an incorrect statement of the law"].)

omitted.)  The instruction comports with the well-established principle that self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack . . . is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1; accord, *People v. Enraca* (2012) 53 Cal.4th 735, 761; see also § 197, subd. (3); CALJIC No. 5.54 [defining an initial aggressor as a person "who initiated an assault"].)

Given the trial court's express erroneous answer to the jury's question, there is more than a " ' "reasonable likelihood" ' that the jury understood [CALCRIM No. 3471] in a legally impermissible manner," to limit appellant's right to self-defense if he started a fight with verbal and threatening conduct short of a physical assault. (*People v. Canizales* (2019) 7 Cal.5th 591, 613 (*Canizales*).)  The prosecutor's closing statements, as summarized above, reinforced that misunderstanding because the prosecutor repeatedly and erroneously argued that appellant was not entitled to act in self-defense because appellant started the conflict and approached the victims under threatening circumstances.  (See *ibid.* [observing that the prosecutor's "closing argument substantially aggravated the potential for confusion"]; *People v. Myles* (2023) 89 Cal.App.5th 711, 737 ["The prosecution's statements in closing arguments magnified the instructional error"].)  Contrary to the prosecutor's arguments, "[t]hough a defendant 'set[s] in motion the chain of events that led the victim to attack the defendant,' he or she still may assert a claim of self-defense." (*Ramirez, supra,* 233 Cal.App.4th at pp. 950–951; see also *id.* at p. 948 [prosecutor erred in arguing, " 'You can't go looking for trouble and then complain about the

trouble that you find.' "].)[6]  Because there is a reasonable likelihood the jury misunderstood the law of self-defense, we must reverse appellant's conviction for voluntary manslaughter unless it is " 'clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error' " (*Canizales*, at p. 615)—that is, if the trial court had told the jury that the limitations on the right to self-defense described in CALCRIM No. 3471 only applied if appellant started a fight with a physical assault.  (See *People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1344, 1347 [applying beyond a reasonable doubt standard where error " 'undermined' " the defendant's self-defense claim].)

Respondent argues appellant was not prejudiced because there was no evidence of a nonphysical fight before the shooting.  We disagree.  Appellant testified the victims responded with suspicion and profanity when he asked them for "weed."  Furthermore, the surveillance video showed that appellant and the victims spoke for 30 seconds, which would support an inference that appellant was not forthcoming about the content of the exchange.  Subsequently, appellant approached the victims' car late at night on an empty street.  The prosecutor argued strenuously and repeatedly in his closing argument that appellant behaved aggressively and threateningly, and "created the situation" and "drama," by approaching the victims in the manner that he did.  (See *Canizales*, *supra*, 7 Cal.5th at p. 615 [prosecution's closing arguments are relevant to prejudice analysis]; *Ramirez, supra*, 233

---

[6] The record does not support respondent's assertion that the prosecutor argued only "that appellant's deadly initial aggression was the act of shooting."  We need not consider whether the prosecutor's argument was misconduct; for purposes of appeal, it is sufficient to observe that the closing argument exacerbated the prejudicial impact of the trial court's erroneous answer to the jury's question.

11

Cal.App.4th at p. 946 ["The prosecutor highlighted the instruction in closing argument. The prosecutor argued it precluded any claim of self-defense even if defendants only instigated a fistfight."].) Indeed, a reasonable inference from the record is that the jury asked the trial court its question about CALCRIM No. 3471 *because* the prosecutor argued appellant lost his right to self-defense by starting a fight through his pre-shooting conduct. And it is unlikely the jury would have asked the question if all jurors believed appellant did *not* start a nonphysical fight. (See *People v. Thompkins* (1987) 195 Cal.App.3d 244, 250 (*Thompkins*) ["A jury's request for reinstruction or clarification should alert the trial judge that the jury has focused on what it believes are the critical issues in the case"]; see also *Canizales*, at p. 617 ["The jury's questions during deliberations are also instructive"].)

Accordingly, it is likely at least one juror believed appellant *did* "start a fight" with the victims through verbal and nonverbal conduct before the shootings. The jury was told that, in those circumstances, appellant could only exercise self-defense if he attempted to withdraw. Because there is no evidence of any attempt to withdraw before the shootings, any juror who believed appellant started a fight would have rejected appellant's self-defense claim even if they believed his testimony that victim Salazar-Gonzalez drew his gun first. And we cannot conclude beyond a reasonable doubt that no juror would have believed that testimony, given that Salazar-Gonzalez *did* shoot appellant and that the jury found Salazar-Gonzalez provoked appellant prior to the shooting. Further, "there is no category of instructional error more prejudicial than when the trial judge makes a mistake in responding to a jury's inquiry during deliberations." (*Thompkins*, *supra*, 195 Cal.App.3d at pp. 252–253; see also *Bollenbach v. United States* (1946) 326 U.S. 607, 612 ["Particularly in a criminal trial, the judge's last word is apt to be the decisive

12

word"].)  Here, the circumstance that the jury rendered a verdict only an hour after the trial court answered its question suggests the answer may have been critical to the jury's decision.  (See *People v. Gay* (2008) 42 Cal.4th 1195, 1226 ["It is discomforting . . . that, following this inadequate reinstruction, the jury reached a verdict the very next morning"].)

Accordingly, we reverse appellant's conviction for voluntary manslaughter as to victim Salazar-Gonzalez because the trial court's erroneous instruction prejudicially lessened the prosecution's burden of proof that appellant did not act in self-defense.  (*People v. Banks* (1976) 67 Cal.App.3d 379, 384 ["the prosecution must prove beyond a reasonable doubt the absence of justification, herein self-defense, when the issue is properly presented in a homicide case"].)  For the same reason, we must reverse appellant's conviction for shooting at an occupied vehicle.  (See CALCRIM No. 965 [providing that prosecution must prove "[t]he defendant did not act in self-defense"].)  However, for the reasons explained below, we do not reverse appellant's conviction for the second degree murder of victim Miranda-Castillo.

II.    *No Error in Failure to Instruct on Transferred Intent*

Appellant also argues the trial court erred because "[t]he jury was not instructed that any defenses that applied to the killing of Salazar-Gonzalez also applied to the killing of Miranda-Castillo.  The jury convicted [appellant] of voluntary manslaughter as to Salazar-Gonzalez, but did not know that the defense that reduced the offense from murder to manslaughter also applied to the charges related to Miranda-Castillo."  In particular, appellant contends the trial court erred in failing to give an instruction on transferred intent.  Appellant has not shown the court erred.

"Even absent a request, the trial court must instruct on the general principles of law applicable to the case.  [Citation.]  The general principles of law governing a case are those that are commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case.  [Citation.]  The trial court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case.  [Citation.]  Evidence is 'substantial' only if a reasonable jury could find it persuasive."  (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)  In determining whether the evidence supports a particular instruction, the court must consider the evidence "in the light most favorable to the defendant."  (*People v. Mentch* (2008) 45 Cal.4th 274, 290.)

"[T]he common law theory of 'transferred intent' . . . establishes that one's criminal intent follows the corresponding criminal act to its unintended consequences. . . . [T]he reasoning applies equally to carry the *lack of criminal intent* to the unintended consequences and thus preclude criminal responsibility.  The theory was explained . . . as follows: 'Clearly, one who kills in self-defense does so without the *mens rea* that otherwise would render him culpable of the homicide.  Therefore, if the act of taking the life of an assailant is not criminal[,] does it become so when a stray shot kills a bystander?' "  (*People v. Mathews* (1979) 91 Cal.App.3d 1018, 1023 (*Mathews*).)  Thus, "the doctrine of self-defense is available to insulate one from criminal responsibility where his act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander."  (*Id.* at p. 1024; accord, *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1038–1039 (*Vallejo*); *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357 (*Curtis*).)

14

CALCRIM No. 562 addresses transferred intent, and it makes clear that the principle also applies to partial defenses like provocation and imperfect self-defense. The instruction provides in relevant part, "If the defendant intended to kill one person, but by mistake or accident also killed someone else, then the crime, if any, is the same for the unintended killing as it is for the intended killing." (CALCRIM No. 562.) Appellant argues, "The circumstances of Miranda-Castillo's death, where the jurors evidently found that [appellant] fired in response either to Salazar-Gonzalez's firing his gun or his threatening, provocative conduct, mandated the delivery of" that language in CALCRIM No. 562.

However, to support the transferred intent instruction, the killing of Miranda-Castillo had to be *inadvertent*, meaning by mistake or accidental. (CALCRIM No. 562; *Mathews*, *supra*, 91 Cal.App.3d at p. 1023; *Vallejo*, *supra*, 214 Cal.App.4th at pp. 1038–1039; *Curtis*, *supra*, 30 Cal.App.4th at p. 1357.) The evidence at trial, and especially appellant's own testimony, demonstrates that the killing of Miranda-Castillo was *not* inadvertent because appellant acknowledged he knew he was firing at *both* victims. He testified that, when he arrived on Crosby Avenue, his companion pointed at the victims' car and said, "Well, what about those guys in that car?" Appellant described nodding at and speaking to both victims in the initial interaction. When the prosecutor asked appellant if he was aware he "shot at almost point blank range into a vehicle," appellant acknowledged, "I know I was shooting at *them*."[7] (Italics added.) The prosecutor followed up by asking, "You're aware that you had shot into a car with at least two people,"

_____

[7] At another point in his testimony, appellant said he was "aiming in the general direction . . . of where the shots came from." That "general direction" included where Miranda-Castillo was sitting, next to Salazar-Gonzalez.

15

and appellant answered, "Yes." Later, appellant admitted he was "shooting at close range to the people in the car." The prosecutor asked, "You didn't care that there was a passenger; right?" Appellant answered, "That never crossed my mind, no," and then he admitted he "knew there was a passenger in the car when [he] walked up." He had previously testified that at the time of the shooting he could see "silhouettes" of both victims. He also admitted "shoot[ing] through the back of that car" as he returned to his vehicle. At no point did appellant testify that he was shooting only at Salazar-Gonzalez and that he hit Miranda-Castillo only by mistake.

Appellant fails to explain in his briefs how the evidence supported a finding that the killing of Miranda-Castillo was inadvertent. He argues, "The testimony at trial centered on the interaction between [appellant] and Salazar-Gonzalez and [appellant's] subsequent action of shooting at Salazar-Gonzelez's side of the car." But that is in no way inconsistent with the evidence that appellant knew Miranda-Castillo was in the car and was likely to be hit by the barrage of bullets appellant shot into the car's passenger compartment, both from the driver's side and from the rear of the vehicle. Indeed, as noted above, appellant acknowledged in his testimony that he fired at *both* victims.

The jury was instructed that, to find appellant guilty of second degree murder based on implied malice, it had to find that he "intentionally committed an act," the "natural and probable consequences of the act were dangerous to human life," "he knew his act was dangerous to human life," and he "deliberately acted with conscious disregard for human life." (See *People v. Chavez* (2018) 22 Cal.App.5th 663, 682.) Appellant's testimony, in which he admitted shooting repeatedly into the parked car and "at" both victims, provided ample basis for the jury's verdict. And the verdict of

16

voluntary manslaughter as to Salazar-Gonzalez and murder as to Miranda-Castillo necessarily reflects a finding that whatever provocation mitigated the killing of Salazar-Gonzalez was not sufficient to mitigate the killing of Miranda-Castillo.[8]

Thus, appellant's claim fails because there is no evidence the shooting of victim Miranda-Castillo was "inadvertent." (*Mathews*, *supra*, 91 Cal.App.3d at p.1023; see *Vallejo*, *supra*, 214 Cal.App.4th at p. 1039 ["evidence did not support an instruction on transferred self-defense" where appellant testified he "shot 'warning shots into the ground' " and did *not* "testify that he had intended to shoot an aggressor but had inadvertently shot [the victim] instead"].) Appellant has not shown the trial court erred in not instructing on transferred intent, and he has not provided any other basis for reversing the conviction for the murder of Miranda-Castillo.[9]

III. *Appellant Has Not Established Prosecutorial Misconduct*

Appellant contends the prosecutor committed misconduct in various ways during his closing arguments. The most substantial aspect of the

---

[8] Regarding heat of passion voluntary manslaughter, the jury was instructed, "The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." It appears the jury found that the provocation that occurred was sufficient to provoke a person of average disposition to shoot at Salazar-Gonzalez but not sufficient to provoke such a person to shoot at Miranda-Castillo.

[9] Appellant contends defense counsel's failure to request an instruction on transferred intent was ineffective assistance of counsel. Because appellant has not shown the evidence supported the giving of the instruction, the claim fails. (*People v. Dennis* (1998) 17 Cal.4th 468, 541 [failure to request instruction not deficient performance where "defendant was not entitled to such an instruction in any event"].)

contention relates to a range of different comments the prosecutor made about appellant's self-defense claim. We need not address those aspects of the prosecutorial misconduct claim, because we reverse appellant's convictions for voluntary manslaughter and shooting at an occupied vehicle on other grounds (see Part I, *ante*) and because those comments were not directly relevant to the charge based on the killing of Miranda-Castillo, who did not threaten appellant (see Part II, *ante*).[10] The remaining aspect of the prosecutorial misconduct claim is that the prosecutor improperly "insinuate[d] that the shooting was gang-related and that [appellant] was retaliating for a prior incident in the neighborhood." Appellant fails to demonstrate prejudicial misconduct.[11]

---

[10] To the extent appellant argues that any of the prosecutor's allegedly improper statements relating to appellant's self-defense claim also had prejudicial impact with respect to the count two murder conviction, we conclude there is no reasonable probability of prejudice. As explained in Part II, *ante*, the doctrine of transferred intent did not apply to the killing of Miranda-Castillo and the evidence strongly supported the verdict.

[11] Appellant's additional claim that the prosecutor committed misconduct by telling the jury that "carrying a gun satisfied the 'intentional act' element of implied malice murder" requires little discussion. Even if the prosecutor's argument could be so construed, there is no likelihood of prejudice given that appellant deliberately and repeatedly fired into the victims' car. (*In re Ferrell* (2023) 14 Cal.5th 593, 604 [implied-malice murder requires "an act whose natural consequences are dangerous to life" and "deliberate performance of the act with conscious disregard for life"].) Appellant also has not shown prejudice from the prosecutor's brief references to gun violence in Oakland. Nor has appellant shown any likelihood of cumulative error from the prosecutor's arguments. Because appellant has not shown prejudicial error, we need not consider to what extent appellant's claims of prosecutorial misconduct have been forfeited and whether any such forfeiture was ineffective assistance of counsel.

During the cross-examination of appellant, the prosecutor asked appellant if he was on Crosby "looking for somebody . . . to start trouble with." The prosecutor then asked if there had "been a shooting near Crosby and 35th a few weeks before," whether appellant knew anyone involved in that shooting, and whether he was "on Crosby looking for somebody involved in that shooting." Defense counsel's objection to the line of questioning was overruled. Previously, the prosecutor had elicited evidence that both men worked at Red Boy Pizza and wore red hats, which appellant argues was a violation of an in limine ruling excluding references to gang colors. Finally, during the prosecutor's closing argument, he argued that appellant was "looking for somebody" when he drove down Crosby.

Appellant has not demonstrated prejudicial prosecutorial misconduct. "When a claim of misconduct is based on the prosecutor's comments before the jury, . . . ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Gonzales & Soliz* (2011) 52 Cal.4th 254, 305.) The prosecutor asked a brief series of questions that implied appellant might not have been on Crosby Avenue to buy marijuana; appellant answered in the negative to all the prosecutor's questions. During closing argument, the prosecutor pointed out that he was not required to prove motive and commented, "[Appellant] wants to contact the victims. He wants to talk to them. We're never gonna know why. The story he told isn't the truth. You all should be able to see that. And we're not going to know why."

---

Because the materials are unnecessary to resolve appellant's prosecutorial misconduct claim, we deny appellant's June 21, 2024 request for judicial notice of the prosecutor's misconduct in prior matters.

During his closing argument, defense counsel pointed out that the prosecution's retaliation suggestion made no sense, arguing, "If there was some grand plan to shoot these two men for no reason, there is no motive here, there is no knowledge of who they are, there is nothing. But let's assume that we are going to shoot them. Would we do it like this? Please." In particular, he pointed out it would make no sense to "walk up and have chitchat . . . , get back in their car, drive off, come back" if there was a premeditated plan to kill the victims.

"[A] prosecutor commits misconduct by asking 'a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means.'" (*People v. Earp* (1999) 20 Cal.4th 826, 859–860.) Assuming the prosecutor's questions were improper, it is not "reasonably probable" the jury would have reached a more favorable verdict as to the death of victim Miranda-Castillo in the absence of the challenged questions and argument. (*People v. Crew* (2003) 31 Cal.4th 822, 839.) In context, the prosecutor's questions can be construed to suggest a possible alternate explanation for the killing. However, the questions were brief, the prosecutor presented no evidence of a prior shooting or that appellant acted in retaliation, the prosecutor acknowledged that the motive for the shooting was unknown, and the trial court instructed the jury that "[n]othing that the attorneys say is evidence." Furthermore, as explained previously, the evidence amply supported the second degree murder conviction. Appellant has not demonstrated prejudicial misconduct.[12]

---

[12] The prosecutor's question of an early witness, "Did [the victims] wear red hats for Red Boy Pizza?" does not have any significant weight in our analysis. Appellant cites nowhere in the record where the hats were

IV.    *We Remand for Resentencing on the Count Two Murder Conviction*

On the count three conviction for shooting at an occupied vehicle, the trial court imposed a sentence of 30 years to life, including the five-year midterm and a term of 25 years to life on a section 12022.53, subdivision (d) firearm enhancement.  On the count two murder conviction, the trial court imposed (and stayed under section 654) a sentence of 40 years to life, including a term of 15 years to life for the murder and a 25-years-to-life sentence on the section 12022.53, subdivision (d) firearm enhancement associated with the count.[13]  As to those firearm enhancements, appellant argues remand is required because the court did not consider certain statutory limitations on its discretion.  We need not resolve appellant's claim as to count three, which we reverse (see Part I, *ante*).  But, because the reversal has the effect of lifting the stay on count two (*In re Pope* (2010) 50 Cal.4th 777, 784), we must address appellant's claim as to the firearm enhancement imposed on that count.[14]

---

connected to gang membership or where the prosecutor made any further reference to the hats, in questioning or argument.

[13] The trial court also imposed and stayed sentences on other enhancements associated with count two, including a 20-year term under section 12022.53, subdivision (c); a ten-year term under section 12022.53, subdivision (b); and a ten-year term under section 12022.5, subdivision (a).

[14] On the count one voluntary manslaughter conviction, the trial court imposed (and stayed pursuant to section 654) a 21-year sentence, including the 11-year upper term and a ten-year sentence on a section 12022.5, subdivision (a) firearm enhancement.  As to that sentence, appellant argues that remand for resentencing is required because the trial court imposed the upper term on the offense and enhancement "based on its own findings as to aggravating factors, on facts that were elements of the offense of manslaughter, and on facts used to impose the firearm enhancements."  Because we reverse as to that count, we need not resolve appellant's claim.

Effective January 1, 2022, the Legislature enacted Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) (Senate Bill 81), which "amended section 1385 to provide guidance regarding the exercise of discretion in dismissing sentencing enhancements." (*People v. Anderson* (2023) 88 Cal.App.5th 233, 238; see also *People v. Walker* (2024) 16 Cal.5th 1024 (*Walker*).) Senate Bill 81 added subdivision (c), which requires a court to dismiss sentencing enhancements if it is in the furtherance of justice to do so (§ 1385, subd. (c)(1)) and to "consider and afford great weight" to evidence offered by the defense to prove that specified mitigating factors are present (§ 1385, subd. (c)(2)). Presence of a specified factor "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).) " 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (*Ibid.*) As relevant here, one of the mitigating circumstances is that an enhancement could result in a sentence of over 20 years, in which case "the enhancement shall be dismissed" (§ 1385, subd. (c)(2)(C)), except where doing so "would endanger public safety" (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 17–18).

Appellant argues the trial court was unaware of this new direction as to how to exercise its discretion.[15] " ' "Defendants are entitled to sentencing

---

[15] We reject respondent's contention that appellant forfeited the claim by failing to raise it below. (See *People v. Panozo* (2021) 59 Cal.App.5th 825, 840 (*Panozo*) [where the appellant "does not challenge the manner in which the trial court *exercised* its sentencing discretion but rather its apparent misapprehension of statutory sentencing obligations[,] . . . forfeiture . . . is inappropriate"].) We therefore need not and do not address appellant's alternative contention that his trial counsel rendered ineffective assistance of counsel by failing to raise the challenge below. Appellant has also asserted

decisions made in the exercise of the 'informed discretion' of the sentencing court.  [Citations.]  A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 424 (*Salazar*).)  " 'If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law.  [Citation.]  Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal.' " (*Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 709 (*Wade*).)

While "sentencing courts are generally presumed to have acted in accordance with legitimate sentencing objectives," "where the record is not silent, but rather is 'at the very least ambiguous as to whether the court understood its [statutory] obligation,' " the presumption cannot be relied on. (*Panozo*, *supra*, 59 Cal.App.5th at p. 839.)  In *Panozo*, the court concluded the record was ambiguous and remand was required where the defense counsel, prosecutor, and probation report all failed to reference the court's statutory obligation to consider the defendant's military-service-related posttraumatic stress disorder in considering his suitability for probation and as a mitigating factor in selecting a term of imprisonment, and the court's identification of the factors it considered did not include the defendant's stress disorder.  (*Id.* at pp. 837–839; see also *Wade*, *supra*, 33 Cal.App.5th at p. 716, fn. 9

---

his ineffective assistance of counsel claim regarding the various alleged sentencing errors in a petition for writ of habeas corpus, case No. A172654. We have denied that petition by separate order filed this date.

23

[presumption of correctness did not apply where "the court stated its considerations on the record, and none pertained to" the appropriate legal principle]; *People v. Ochoa* (2020) 53 Cal.App.5th 841, 852–854.)

Neither the probation report, the prosecutor, nor defense counsel made any reference to section 1385, subdivision (c); indeed, the probation report was filed in 2020. In its pronouncement of the sentence, the trial court acknowledged its discretion to strike the enhancement (and defense counsel had referenced the court's discretion to select among different firearm enhancements), but that discretion existed prior to the enactment of section 1385, subdivision (c). (See *People v. Tirado* (2022) 12 Cal.5th 688, 695–697.) The trial court did *not* reference section 1385, subdivision (c); did *not* mention the indisputably applicable section 1385, subdivision (c)(2)(C) mitigating circumstance; and did *not* address whether dismissal of the enhancement would endanger public safety. Accordingly, the record is ambiguous as to whether the trial court was aware of the scope of its discretion pursuant to section 1385, subdivision (c).

Where a court was unaware of the scope of its discretion, " 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*Salazar, supra,* 15 Cal.5th at p. 424.) The record does not so indicate. The trial court selected count three as the principal term, imposed a 30-years-to-life sentence on that count, and stayed the sentences on counts one and two under section 654—including the 40-years-to-life sentence on count two. The court indicated it was "comfortable adopting" the prosecutor's proposed 30-years-to-life sentence, but that is shorter than the sentence imposed on count two. The record does not "clearly indicate[]" the court would have declined to impose a

24

lesser firearm enhancement had it exercised its discretion pursuant to the requirements of section 1385, subdivision (c). (*Salazar*, at p. 424; see *Walker*, *supra*, 16 Cal.5th at p. 1029 [under the statute, "if the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors"].)

Accordingly, we will remand for the trial court to exercise its discretion under section 1385, subdivision (c). (See *People v. Diaz* (2023) 97 Cal.App.5th 1172, 1188 [remanding under Sen. Bill 81 because "[t]he obvious reading of the record is that the busy actors in this case had not yet learned of" it].)[16]

## DISPOSITION

The trial court's judgment is reversed as to counts one and three. The matter is remanded to the trial court to permit the People to elect to retry those charges, or, if the People do not elect to retry the case, to proceed with full resentencing on count two, including but not limited to exercise of the trial court's discretion under section 1385, subdivision (c).

---

[16] Appellant argues in a supplemental brief that the trial court erred in imposing (and then staying) a ten-year upper term on the section 12022.5, subdivision (a) firearm enhancement as to count one. The court imposed and stayed the same term for the section 12022.5, subdivision (a) enhancement associated with count two, but appellant does not argue that was error. It is unclear whether that was an oversight. In any event, appellant may raise any concerns about other aspects of his sentence on count two during resentencing.

We also note that, on remand, the trial court may not impose a sentence on count two in excess of the 30-years-to-life sentence originally imposed on count three. (*People v. Hanson* (2000) 23 Cal.4th 355, 357.)

                                        SIMONS, Acting P. J.

We concur.

BURNS, J.
CHOU, J.

(A164977)