Filed 6/17/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br>v.<br><br>JERMAINE JEREMIAH BRIM,<br><br>  Defendant and Appellant. | A170747<br><br>(Alameda County<br>Super. Ct. No. 19CR017660) |

  Defendant Jermaine Brim boarded a BART train and got into a physical fight with another passenger, Oliver Williams. The fight lasted some five minutes, and during it Williams drew a knife and attempted to stab Brim. The fight continued and eventually Brim gained control of the knife, fatally stabbed Williams in the head and neck, and ran from the train. The entire altercation was captured on two BART surveillance cameras.

  Brim was charged with murder and tried by jury, where he testified that he had acted in self-defense. After lengthy deliberations over three days, during which the jury asked several insightful questions of the court, the jury found him guilty of second degree murder and he was later sentenced to 16 years to life in prison. Brim argues that the trial court erred in: (1) stationing an armed deputy near him during his testimony; (2) instructing the jury with CALCRIM No. 3474 regarding the right to self-defense, and in responding to the jury's question about that instruction during its deliberations; and (3) in limiting the jury's consideration of his diminished intellectual capacity by instructing it with CALCRIM No. 3428. We agree

1

that the trial court prejudicially erred in responding to the jury's question regarding CALCRIM No. 3474, and we therefore reverse Brim's murder conviction.  However, because we also conclude that there is substantial evidence to support that conviction, the People may retry Brim for murder.  If they elect not to do so, we direct that the judgment be modified to reflect a conviction for voluntary manslaughter.[1]

## BACKGROUND

### The Altercation on BART

Around 1:00 p.m. on November 19, 2019, Brim boarded a BART train at the San Leandro station.  At the time, he was not wearing shoes.  What happened next was captured on at least two BART surveillance cameras.[2]  We have reviewed the video from those two cameras, and find the following description of their contents in Brim's later-filed motion for acquittal to be generally accurate, except as noted:

"Broadly speaking, the video depicts Mr. Brim enter the BART, take a seat in car 303 and have no interaction with anyone.  He then enters car 1732 where he approaches a gentleman who appears to be sleeping and touches his shoe.  As he touche[s] the shoe, the gentleman stirs and Mr. [Oliver] Williams turns his head and appears to be listening to what is being said.  The video then shows Mr. Brim pull one of the man's shoes off and Mr. Williams look in his direction.  Mr. Williams then gets up and he and Mr. Brim[ ]appear to

---

[1]    Our disposition makes it unnecessary for us to reach Brim's other two arguments on appeal.  Those arguments do not relate to the only difference between perfect and imperfect self-defense—the objective reasonableness of the defendant's belief that deadly force was necessary to save his own life— nor does Brim contend otherwise.

[2]    The record includes five videos:  two videos from each of two cameras on BART car 1732, and one video from BART car 303, showing four angles.

2

exchange some sort of words.  Mr. Brim walks around and away from Mr. Williams and begins to stop and speak to [a passenger] wearing [a] camouflage jacket.  The gentleman in the camouflage jacket sits up as Mr. Brim stops and Mr. Williams comes toward Mr. Brim saying something and gesturing for him to leave the car.  Mr. Brim then leaves the car and Mr. Williams stands in the doorway of car 1732 as he does.

"Not too long after . . . Mr. Brim reenters the car and he and Mr. Williams begin fighting.  At the very beginning of this 8 minute[3] fight, Mr. Brim is seen hitting Mr. Williams several times in his body while Mr. Williams is on [a] yellow seat[,] and then again once they end up on the ground.  Mr. Williams does not hit Mr. Brim back with his hands.  When Mr. Brim hits Mr. Williams while they are on the ground, the video shows that Mr. Williams has a hold of Mr. Brim[']s legs.  Both of them are moving around.  Mr. Williams then rolls and turns over using his boots.  Mr. Brim's leg is between Mr. Williams' legs and the[y] continue to move around like this until the video shows Mr. Williams kick Mr. Brim in the chin face area with his boots.  Mr. Brim begins grasping for Mr. Williams' boots[,] and for a brief moment hold[s] them down toward the seat while Mr. Williams is on his back.  Eventually, Mr. Brim and Mr. Williams are both on the ground with Mr. Brim's legs between Mr. Williams' legs and Mr. Brim and Mr. Williams are holding onto one another by the shirt.

"The BART doors open and close.  Mr. Brim has his right hand on the yellow seat and Mr. Williams begins reaching for his left pocket.  Mr. Brim begins also reaching for the left pocket.  Mr. Brim and Mr. Williams appear to

---

[3]     The video (until Brim leaves the train) is just over seven minutes long, and the fight itself occupies some five minutes.

3

say something before Mr. Williams pulls out a knife from his pocket. The video shows that he switches the knife to his right hand, kicks Mr. Brim back onto the yellow seat with his boots and tries to stab Mr. Brim in the leg area.[4]

"Mr. Brim and Mr. Williams then begin struggling over the knife. Eventually the knife appears to fall to the ground and Mr. Brim picks it up and stabs Mr. Williams multiple times in the head area. Mr. Williams is moving around the whole time. The BART doors then open to the next stop and Mr. Brim gets up and runs from the BART train looking behind him as he runs."

Williams died shortly thereafter from loss of blood caused by multiple stab and incised[5] wounds.

Meanwhile, Brim left the South Hayward BART station, dropping a bloody glove on the stairs and a bloody sweater in the parking lot. He proceeded to a nearby AM/PM mini-mart and purchased a bottle of water, using it to wash blood off his hands and feet. He then went to a nearby car dealership, where Steve Castro, the sales manager, showed him a car for sale. After getting into the driver's seat, Brim asked Castro for the keys, and ended up punching Castro and running away. He next stopped a moving car in the street and entered the passenger side door, causing the driver to take

---

[4]     In his closing argument, the prosecutor argued that "it's pretty clear that when he pulls out the knife, he tries to stab Mr. Brim in the hand."

[5]     According to the forensic pathologist who performed Williams' autopsy, an incised wound "measures bigger or longer on the surface of the skin than . . . its depth into the body."

the keys and flee. Brim exited the vehicle and ran to a nearby bus stop, where he was placed under arrest.[6]

**The Charges**

On November 21, 2019, the Alameda County District Attorney filed a complaint, and on May 20, 2021, the operative information, charging Brim with Williams' murder (Pen. Code,[7] § 187). The information included the special allegations that Brim was on bail or released on his own recognizance at the time of the offense (§ 12022.1), and that during its commission he used a deadly weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury (§ 1203.075).

**The Trial**

A 15-day jury trial took place in August and September of 2023.

The prosecution's witnesses included Sophia Humphrey, a passenger who waited for the train near Brim and witnessed the fight; Wendy Cristy Alas Calles, an employee of the car dealership; Dr. Thomas Rogers, the forensic pathologist who performed Williams' autopsy; and several police officers.

The defense witnesses were Scott Ferreira, an expert in the area of "martial arts, self-defense and human behavior as it relates to human aggression"; Dr. Takeo Toyoshima, an expert in addiction and psychiatry; Brim's ex-girlfriend Tyanna Moore; Brim's cousin Felicia Harrell; and Brim himself. Some of Brim's testimony was as follows.

---

[6] Brim later called his Aunt Mozell from jail and told her: "I swear to God, I didn't say nothing to the guy. The dude was—the guy was like the Hulk, the aggressor. He had the weapon. He told me—he pulled the weapon on me, Auntie, and told me he was about to kill me, and I was so scared, and I fought for myself, and that's what happened."

[7] Further undesignated statutory references are to the Penal Code.

On November 18, 2019, Brim was living in Sacramento, having moved there in May of that year in order to be closer to his then seven-year-old son. Around 5 a.m., he took an ecstasy pill, which he was in the habit of doing approximately four times a month when he felt "most depressed," depression he had been experiencing since the death of his mother in early 2018. Later that day, he took Amtrak and BART trains to San Francisco, arriving around 5:00 p.m., hoping to see his father or his Aunt Mozell. He accidentally left his wallet at home.

Once in San Francisco, Brim tried unsuccessfully to connect with his father and his Aunt Mozell. He went to the bank and obtained a temporary debit card, which he used to purchase a cell phone. He then took BART to Berkeley and tried unsuccessfully to meet up with a friend. He took BART to Oakland and tried to get a hotel room, but the hotel would not take his temporary debit card. At this point it was almost midnight, and Brim was "sleepy, fatigued," "hyperventilating," "feeling unwell," and "just wanted to lay down." He asked the hotel clerk to call an ambulance, which arrived and took him to San Leandro Hospital, where he spent the night.

On the morning of November 19, Mr. Brim called his ex-girlfriend Tyanna Moore and asked her to pick him up. Moore could not come to the hospital until after work, so Brim, eager to leave the hospital and get back home, decided to leave on foot. He left certain of his belongings at the hospital, figuring he could retrieve them later. He was wearing socks, pants, a hospital gown, a gold chain, a gold pendant, and diamond earrings, but no shoes.

After leaving the hospital, Brim went down the block to a tow shop and asked a tow truck driver for a ride to Sacramento. The driver did not give Brim a ride, but gave him a red sweatshirt with a red glove inside. Brim

gave the driver a diamond gold pendant, because he "appreciated him for his gesture of giving me the sweatshirt." Brim also "walked up to the body shop and asked if anybody in there had any extra shoes," but nobody did. Brim then "noticed the BART sign" and went to the BART station, where he boarded car number 303 on a southbound train. Brim took a seat and remained there until the train made the next stop, but shortly thereafter decided to walk to the next car—number 1732.

As to his fight with Williams, Brim testified that after entering car 1732, he approached an individual whose shoes were "not new" because he wanted to "ask the person to purchase them or to exchange for them." Williams then approached him "in an aggressive manner and yelling something at me . . . sort of fuck no, you can't have the shoes. Fuck no and screaming and like really loud and aggressive." Brim "didn't understand why he was approaching me the way he approached me, and . . . was more confused, if anything." As Brim began to interact with the man wearing a camouflage jacket, Williams "interrupted" the interaction, "approaching [Brim] in an aggressive manner," "walking towards me fast and . . . lifting his arms, and yelling." Brim did not "feel like [he] could have stayed there," so he returned to car 303.

However, as Brim was walking in car 303, his "feet were hurting, and I . . . wanted to finish my interaction with the guy for the shoes," so he returned to car 1732. Brim was "going to . . . walk fast past" Williams and "wasn't really focused on" him, but he saw Williams stand up "in like a football position," as though he were "about to make a tackle." Brim "put [his] arms up to block [his] face and . . . mouth," Williams tackled him, and the two started fighting. Brim was six feet tall and weighed about 215

7

pounds, but Brim perceived that Williams "stood taller than me and his size was bigger than me."

When Brim saw Williams reaching for his pocket, he asked "what are you doing," and Williams said " 'now you got to die.' " "[A]fter he said what he said, it really triggered me to get really frightened and scared and I, you know, thought I was about to die." When Williams attempted to stab him, he "saw [his] life flash by," "got really panicky," and "started thinking . . . what if I don't get to see my son any more." Brim did not recall how he got the knife or how many times he stabbed Williams, although he knew it was more than once. Even after stabbing Williams, Brim was still scared because Williams was "grabbing at me and trying to hit me," "holding my arm still," and the two were "still fighting for this knife." When the doors to the train opened, Brim "focused on the door" and "just felt free to run."

Brim also testified that he was "very afraid" of knives, in light of two experiences with them in his past. First, Brim's uncle was fatally stabbed when Brim was five years old, and he recalled "them bringing his [uncle's] items home" and "seeing blood on . . . his personal belongings." And second, when Brim was nine or ten years old, he was playing with his cousin and her friend outside his aunt's house when a taxi came down the street, "crashing into different cars." The taxi stopped some 10 feet away from the children, at which point the passenger fatally stabbed the taxi driver and the bloody knife was "dropped in front of" them.[8]

Dr. Laeeq Evered, a clinical psychologist and neuropsychologist, testified as an expert for the defense. He examined Brim and administered

---

[8]     Brim's cousin, Felicia Harrell, also testified regarding this incident, explaining that it was "traumatizing," that she still does not own any knives, and that she "learned a way . . . to cook . . . by using scissors" as a result.

8

an IQ test, which showed that Brim's IQ was 78, placing him in the 7th percentile—"mean[ing] that 93 percent of the population in Mr. Brim's general age range performs better than him." This percentile is "equivalent to . . . the functioning of maybe a 12 or a 13-year-old," such that Brim was at the "borderline" of "being able to function fully independently," and would have difficulty "perform[ing] higher level tasks" such as "regulating [his] emotions, for example." In particular, when placed in threatening situation, Brim would have "limited problem-solving ability," it would take him "longer to take in [new] information," and his "prefrontal cortex would not be able to regulate the emotional system as well," meaning his "anxiety would likely increase and potentially dramatically." Having reviewed the surveillance video and examined Brim, Dr. Evered opined that Brim's cognitive functioning played a role in the incident, both because he was more likely than most to have a "fear response" to a threatening situation, and less able to "put things into context and think[] that just a minute or two . . . after having a confrontation with someone, that that person may still be confrontational."

**The Prosecutor's Closing Argument**

In his closing argument, the prosecutor argued that Brim was guilty of first degree murder under both a theory of premeditation and deliberation, based on the number and nature of the stab wounds and the fact that Brim had the knife for "over a minute" before stabbing Williams, and on a theory of felony murder, contending that Brim committed the killing during an attempted robbery because he had "attempted to steal the shoes" of the individual he approached when he first entered car 1732. He further argued that the elements of implied malice had been established based on Brim's affirmative responses to his questions about those elements on cross-

9

examination.[9] The prosecutor also argued that "[f]rom the moment the defendant takes that knife from Mr. Williams, he [was] in full mount position" with "complete control of [the] knife," such that thereafter "he did not have a reasonable belief that he was in imminent danger."

Toward the end of his argument, the prosecutor "[r]eally quickly" and "briefly" discussed voluntary and involuntary manslaughter, arguing that they "don't apply," imperfect self-defense in particular because "you are not allowed to claim imperfect self-defense when it is your own wrongful conduct that creates those circumstances. And . . . in this case, I've argued to you that that attempted robbery is that wrongful conduct."

**The Jury Instructions**

The trial court instructed the jury on the imperfect self-defense theory of voluntary manslaughter, pursuant to CALCRIM No. 571, as follows:

---

[9]     Some of those questions were as follows:
      "Q. Thank you. You intentionally stabbed Mr. Williams, correct?
      "A. Yes, while in fear for my life. [¶] . . . [¶]
      "Q. Was it an accident that you stabbed him?
      "A. It was a confrontation, so I would say no.
      "Q. Yes or no, did you understand at the time that stabbing someone was dangerous to human life?
       "A. Yes. [¶] . . . [¶]
      "Q. And in the heat of the moment, you were willing to do whatever it took to save your life, correct?
       "A. Yes.
       "Q. You were willing to do whatever it took to get off this BART train and go see your son, correct, see your family again?
      "A. I wasn't thinking about that. I was thinking about protecting myself.
      "Q. You were willing to do whatever it took to protect yourself, correct?
      "A. Yes."

10

"If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;" and "2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;" but "[a]t least one of those beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] A danger is *imminent* if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed. The danger must seem immediate and present, so that it must be instantly dealt with. It may not be merely prospective or in the near future. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder."

After reading the jury CALCRIM No. 3471 (Right to Self-Defense: Mutual Combat or Initial Aggressor),[10] the trial court instructed the jury with CALCRIM No. 3474 (Danger No Longer Exists or Attacker Disabled):

---

[10] "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting.

11

"The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker no longer appears capable of inflicting any injury, then the right to use force ends."

**The Jury's Deliberations, Questions, and Verdict**

The jury began its deliberations at 4:19 p.m. on Thursday, September 28, but left for the day some 11 minutes later.

Deliberations resumed at 9:30 a.m. on Friday, September 29. At 9:50 a.m., the jury submitted several requests, including for video of Brim's arrest, his phone call with his Aunt Mozell, his visit to the AM/PM mini-mart, and "[a]ll videos and video angles of BART trains 1732 and 303."[11] About an hour later, the requested videos were delivered to the jury deliberation room. The jury was excused for the day at noon.

Deliberations resumed Monday, October 2 at 9:40 a.m., and continued until 5 p.m. They resumed the next morning at 9:48 a.m. Some ten minutes later, the jury submitted two questions to the court, one substantive and one procedural.[12] The substantive question asked: "Is it possible to have judge or

---

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."

[11] The jury also requested transcripts of interviews that two defense witnesses gave to a defense investigator, and a "video of Sophia Humphries being interviewed in the back of the police car," which requests the trial court denied, as the requested material had not been admitted into evidence.

[12] The verdict form said "We, the jury, further find that the defendant DID/DID NOT use a deadly weapon . . . ," and similarly with respect to the great bodily injury special allegation. The jury's procedural question asked, "there are two lines with 'DID/DID NOT' Do we need to circle one?" The trial

12

som[e]one explain difference between 2nd degree murder & voluntary manslaughter?"  After a discussion off the record with counsel, the trial court answered:  "Please, refer to instruction numbers 520 [First or Second Degree Murder], 522 [Provocation: Effect on Degree of Murder], 570 [Voluntary Manslaughter: Heat of Passion] and 571 [Voluntary Manslaughter: Imperfect Self-Defense]."

About an hour later, the jury asked two more questions together on a single form:  (1) "If the defendant met all of the criteria on 520 including implied malice for Second Degree Murder, is it possible for that to be reduced to Voluntary Manslaughter if the conditions on 570 or 571 are met?," and (2) "If the right to self-defense ends as stated on 3474 when the danger no longer exists, can Voluntary Manslaughter-Imperfect Self-Defense theory continue past that point?"  Around 11:42 a.m., after another discussion with counsel off the record, the trial court answered "Please, refer to instructions 522, 570 and 571" to the first question and "Please, refer to instruction 571" to the second.

The jury continued deliberating (without a lunch break) until 2:00 p.m., at which point it was dismissed for the day.

Deliberations resumed at 9:42 a.m. the next morning.  By 10:45 a.m., the jury had reached its verdict, finding Brim guilty of second degree murder and true the special allegations that he used a deadly weapon and personally inflicted great bodily injury during the commission of the offense.

**The Discussion After the Verdict**

After the jury was dismissed and counsel had the opportunity to speak with the individual jurors, defense counsel indicated to the court that she

_____

court answered, "Yes.  Please, circle the one that you find applies to the facts of the case and the law as I have provided."

"had some things I wanted to put on the record." She went on to explain that with respect to the jury's questions the previous day, "[m]ost of the conversation happened in chambers" and "[w]e didn't go on the record." But in particular with respect to the jury's second set of questions, "Mr. Marin had a position at the time, but that's not really what I'm addressing. In chambers when we discussed it, I indicated I wanted the Court to answer it to say yes, as to the second question specifically. [¶] The Court was very clear that the Court felt it was a factual issue and would just redirect them back to the instruction, but I want the record to be really clear that I did, when we had this discussion, say—I wanted the answer to be yes."

That morning, while the jury was still deliberating, defense counsel had asked to reopen argument under California Rules of Court, rule 2.1036,[13] a request the trial court denied as premature. She went on: "But I want the record to be really clear that I objected in terms of I do feel, and we did learn information that the jurors were split six-six as of yesterday afternoon, that I wanted the record to reflect that I had requested that based on the legal nature of the questions posed to the Court yesterday—and it should be noted, I think the Court's noted it before, but it should be obvious for the record that the jurors never asked for any read back of anything—

"THE COURT: Right.

"MS. BROWN:—in this case. So it does appear they were purely grappling with [a] legal determination based on the facts. And so I wanted

---

[13] California Rules of Court, rule 2.1036 provides, in relevant part, that "[a]fter a jury reports that it has reached an impasse in its deliberations," and "[i]f the trial judge determines that further action might assist the jury in reaching a verdict, the judge may: [¶] . . . (3) Permit attorneys to make additional closing arguments." (Cal. Rules of Court, rule 2.1036(a) & (b).)

14

the record to be really clear that I had requested those things between yesterday and this morning."

Neither the trial court nor the prosecutor disputed defense counsel's description of what took place off the record with respect to the jury's questions. The trial court explained that "yesterday specifically when we talked about the second set of questions," and in particular the second question, "I referred them specifically to instruction 571, because that very explicitly, in the Court's determination, gives the law on what they can consider." With respect to defense counsel's request to reopen argument, the trial court said it denied it because, "although it was clear to the Court that they were probably focusing on the voluntary manslaughter and the second degree murder, there was not a note sent out indicating that they were at an impasse." The trial court then set a date for sentencing.

On April 2, 2024, the trial court sentenced Brim to 15 years to life, plus one consecutive year for the deadly weapon special allegation.

Brim filed a notice of appeal.

## DISCUSSION

CALCRIM No. 3474, contained within a section titled, "Self-Defense and Defense of Another," provides: "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker no longer appears capable of inflicting any injury, then the right to use force ends."

Brim argues that because CALCRIM No. 3474 tells jurors that a defendant's "right to use force in self-defense" ends when the danger no longer "reasonably appears to exist," it is unclear—and the instruction itself does not explain—that this limitation applies only to *perfect* self-defense, but not to *imperfect* self-defense. He argues that the trial court erred when it

15

"refused to give a simple and straightforward answer" (i.e., "yes") to the jury's question as to whether it could rely on imperfect self-defense even if the right to use perfect self-defense had ceased under this instruction.[14]  We agree.

**The Law of Imperfect Self-Defense**

As we explained in *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744:  "A homicide is considered justified as self-defense where the defendant actually and reasonably believed the use of deadly force was necessary to defend himself from imminent threat of death or great bodily injury.  Under such circumstances, the killing is not a crime.  (*People v. Elmore* (2014) 59 Cal.4th 121, 133–134; § 197; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 67 et seq., p. 507 et seq.)  Where the defendant kills while actually but *unreasonably* believing the use of deadly force was necessary, defendant is considered to have acted in imperfect self-defense.  Imperfect self-defense is not a complete defense to a killing, but negates the malice element and reduces the offense to voluntary manslaughter.  (*People v. Elmore*, *supra*, 59 Cal.4th at p. 134; *People v. Blakeley* (2000) 23 Cal.4th 82, 88; *People v. Flannel* (1979) 25 Cal.3d 668, 672.)  'The subjective elements of self-defense and imperfect self-defense are identical.  Under each theory, the [defendant] must actually believe in the need to defend . . . against imminent peril to life or great bodily injury.'  (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.)  As the California Supreme Court summarized it in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082:  'For killing to be in self-defense, the defendant must actually and reasonably believe in the need to

---

[14]     We need not consider Brim's alternative argument regarding CALCRIM No. 3734, that provision of the instruction permitted the jury to convict him of murder even if all the elements of imperfect self-defense had been established.

defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," i.e., "the defendant is deemed to have acted without malice and cannot be convicted of murder," but can be convicted of manslaughter. [Citation.] To constitute "perfect self-defense," i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.]' (Fn. omitted.)"

Moreover, if a defendant testifies that he acted in self-defense, the absence of perfect or imperfect self-defense is an element of the crime, and the prosecution must prove such absence beyond a reasonable doubt. (See § 197; *People v. Morales* (2021) 69 Cal.App.5th 978, 988; CALCRIM No. 505; CALCRIM No. 571.) As our Supreme Court has explained, "when substantial evidence of imperfect self-defense is present, the malice element of murder requires the People to prove beyond a reasonable doubt not only that the defendant committed an unlawful, intentional killing, but also that the defendant did not kill in an actual but unreasonable belief in the need for self-defense. [Citations.] Stated more simply, because malice is absent when imperfect self-defense is present, the prosecution cannot prove malice without disproving imperfect self-defense." (*People v. Schuller* (2023) 15 Cal.5th 237, 254–255 (*Schuller*).)

**The Trial Court's Duty to Clear Up Jury Confusion**

"The court has a primary duty to help the jury understand the legal principles it is asked to apply." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*).) And under section 1138, if a deliberating jury "desire[s] to be informed on any point of law arising in the case . . . the information required must be given." (§ 1138; see *People v. Brooks* (2017) 3 Cal.5th 1, 97.) "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are

17

sufficient to satisfy the jury's request for information. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213.) Indeed, comments diverging from the standard are often risky. [Citation.] The trial court [may be] understandably reluctant to strike out on its own. But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Beardslee, supra*, 53 Cal.3d at p. 97; see *People v. Brooks, supra*, 3 Cal.5th at p. 97.)

Thus, although the trial court need not always elaborate on the standard instructions, section 1138 "imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez, supra*, 51 Cal.3d at p. 1212, superseded by statute on another ground as stated in *Satele v. Superior Court* (2019) 7 Cal.5th 852, 857; see *People v. Dykes* (2009) 46 Cal.4th 731, 802 [section 1138 imposes a "general obligation" to " 'clear up any instructional confusion expressed by the jury' "].) "That further guidance may not come easily to hand, or is not supplied by counsel, does not excuse the court from its statutory duty." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1047.)

We review for an abuse of discretion the trial court's determination how best to answer a jury's question under section 1138. (See *People v. Waidla* (2000) 22 Cal.4th 690, 745–746 ["An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury"]; *People v. Hodges* (2013) 213 Cal.App.4th 531, 539.)

"Various definitions and principles describing the abuse of discretion standard of review have been stated and repeated in numerous cases, such as

18

in *Blank v. Kirwan* (1985) 39 Cal.3d 311, 331, that we will set aside a trial court ruling only upon a showing of ' " 'a clear case of abuse' " ' and ' " 'a miscarriage of justice.' " ' . . . [¶] . . . [¶] [O]ur colleagues in Division Four of this court observed that 'Abuse of discretion has at least two components: a factual component . . . and a legal component. [Citation.] This legal component of discretion was best explained long ago in *Bailey v. Taaffe* (1866) 29 Cal. 422, 424: "The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . ." ' " (*People v. Jacobs* (2007) 156 Cal.App.4th 728, 736–738, quoting *Concord Communities v. City of Concord* (2001) 91 Cal.App.4th 1407, 1417.)

That legal component was abused here.

## The Trial Court Abused Its Discretion In Responding to the Jury's Third Question

The jury's first question—as noted, asked well into its many hours, indeed days, of deliberations—regarding the difference between second degree murder and voluntary manslaughter suggests that it had rejected the prosecution's felony murder theory as well as exoneration based on perfect self-defense, and was instead focused on whether Brim's subjectively-held beliefs could reduce what would otherwise be a murder conviction to one for voluntary manslaughter. The jury's second question made this even more explicit, suggesting that the jury had found that the prosecution had proved "all of the criteria" for implied malice—perhaps based on Brim's own testimony, as emphasized by the prosecutor in his closing argument—but

19

also had some doubt as to whether the prosecution had proved that Brim had not acted in imperfect self-defense or in the heat of passion. As it had done in response to the jury's first question (except for the instruction on murder itself), the trial court referred the jury to the instructions on provocation, heat of passion, and imperfect self-defense.

Then, as noted, the jury's third question was, "If the right to self-defense ends as stated on [CALCRIM No.] 3474 when the danger no longer exists, can Voluntary Manslaughter-Imperfect Self-Defense theory continue past that point?"

The jury's apparent confusion was somewhat understandable. Although the instructions elsewhere referred to "complete," "lawful," and "imperfect" self-defense, CALCRIM No. 3474 was a stand-alone instruction that referred only to the right to "self-defense." (See CALCRIM No. 571 ["complete" and "imperfect" self-defense]; CALCRIM No. 505 ["lawful" self-defense].) And if the jury misunderstood the "right to self-defense" in CALCRIM No. 3474 to encompass both perfect and imperfect self-defense, there was a direct contradiction between the objective standard there described ("as long as the danger exists or reasonably appears to exist") and the subjective standard of CALCRIM No. 571, requiring only that the defendant "actually believe[d]" the use of deadly force was necessary to avoid imminent danger of death or great bodily harm. (CALCRIM No. 571; see *ibid.* [defining danger as imminent if "the danger actually existed *or the defendant believed it existed*" and requiring that "[t]he danger must *seem* immediate and present" (italics added)].) The jury's question suggests that at least some jurors may have harbored just such a misunderstanding.

Moreover, the point was not academic. As noted, the prosecutor had repeatedly argued during his closing argument that once Brim gained control

20

of the knife towards the end of his altercation with Williams, any danger justifying "self-defense" no longer existed. Indeed, he twice made explicit reference to CALCRIM No. 3474, telling the jury that the instruction contained "the same argument I'm making to you . . . [o]nce [Brim] has control of that knife, once he's in full mount position, that danger does not exist, and it does not reasonably appear to exist,"[15] and returning to the instruction in rebuttal: "[A]s we know in this case, Mr. Williams was no longer armed when he was being stabbed in the neck, the face, in the back of the head. [¶] And I'd ask you to look at that instruction about the attacker being disabled and that [sic] it does apply in this case, because Mr. Williams no longer had a weapon. He wasn't posing a threat when Mr. Brim was on top of him. Self-defense does not apply in this case for those reasons."

But as defense counsel argued to the trial court—and as the Attorney General does not dispute—the answer to the jury's question was "Yes." This is because there is no "right" to kill in imperfect self-defense; instead, a defendant who does so has killed unlawfully and is guilty of voluntary manslaughter. (See *Schuller*, *supra*, 15 Cal.5th at p. 252.) But this is a bit of a fine point. Perhaps it can be derived by carefully correlating the

---

[15] "There are other instructions that further my point. 3474, the danger no longer exists or attacker disabled. 'The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist.' [¶] It's the same argument I'm making to you. Once he has control of that knife, once he's in full mount position, that danger does not exist, and it does not reasonably appear to exist. [¶] 'When the attacker withdraws'—and I'm using the law uses [sic] the word 'attacker.' I'll have some conversation about who was the attacker in this case and who wasn't. 'When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends.' [¶] Again, when he is on his back, when Mr. Brim has the knife, when he is in full control of Mr. Williams' body, Mr. Williams no longer appears capable of inflicting any injury whatsoever at that point. Mr. Brim is in a hundred percent full control of that situation at that point."

instructions on homicide, justifiable homicide, murder, voluntary manslaughter, and self-defense. (See CALCRIM Nos. 500, 505, 520, 571, 3474.) On a silent record, we might well assume that the jury successfully performed just such a correlation. (See *People v. Thomas* (2023) 14 Cal.5th 327, 382 [" 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions' "], quoting *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) But the jury's questions in this case indicate otherwise—this is not a silent record.

And in responding to the jury's question by simply directing it—for the third time—to refer to CALCRIM No. 571, the trial court did nothing to clear up the instructional confusion the jury had expressed. Perhaps the jury's first two questions had answers that could be found in the instructions the jury had already been given, but this question did not. The question makes clear that at least some members of the jury erroneously thought that the "right to self-defense" in CALCRIM No. 3474 encompassed imperfect self-defense. Under CALCRIM No. 3474, that right ends when the danger has objectively passed, while under CALCRIM No. 571, the "right" continues so long as the defendant subjectively believes the danger is present. Can imperfect self-defense reduce the defendant's would-be murder conviction to voluntary manslaughter after the danger has objectively passed? It depends which instruction you ask. Given that the jury's question was about how to harmonize two seemingly conflicting instructions, simply directing the jury to refer back to one of those instructions failed to fulfill the trial court's obligation under section 1138 to clear up the jury's instructional confusion.[16]

_____

[16] As noted, defense counsel suggested that the trial court referred the jury to CALCRIM No. 571 because in its view it "was very clear" that the question presented a "a factual issue." We do not have the benefit of a

22

(See *People v. Loza* (2012) 207 Cal.App.4th 332, 355 ["Because it was clear from the jury's questions that the instructions that the court had already given had left the jurors confused, it was not enough for the court to inform the jurors, in response to their specific inquiry, that they must rely on the very instructions that had confused them"]; *People v. Nero* (2010) 181 Cal.App.4th 504, 518 [trial court misinstructed the jury by rereading two instructions in response to jury's question where proper answer was "yes"]; *People v. Gonzales* (1999) 74 Cal.App.4th 382, 390–391 [rereading instructions already given in response to jury question constituted error where instructions "inadequate" to respond to jury's confusion], disapproved on another ground in *People v. Anderson* (2011) 51 Cal.4th 989, 997–998 & fn. 3.)

The Attorney General fails to persuade us otherwise.  We first address his reliance on what appears to be the only authority addressing the relationship between CALCRIM No. 3474 and imperfect self-defense, *People v. Thomas* (1990) 219 Cal.App.3d 134 (*Thomas*).  Such reliance is unavailing.

In *Thomas*, the defendant had a verbal altercation with the victim outside a bar, shot him causing great bodily injury, and was later convicted by a jury of attempted murder.  (*Id*. at pp. 138–139.)  He argued that the jury was likely confused by the interplay between the CALJIC instruction on imperfect self-defense (CALJIC No. 517) and the CALJIC equivalent of

_____

transcript of the discussion between the trial court and counsel about how to respond to the question, because such discussion evidently took place in chambers and off the record, and the position of the prosecutor was never put on the record.  But as discussed, the question was a purely legal one, and to the extent the trial court took this view, this too was error.  (See *People v. Moore* (1996) 44 Cal.App.4th 1323, 1332 [trial court violated duty under section 1138 where answer "effectively told the jury the court could not help" and "improperly left the jury with the responsibility for deciding a question of law"].)

CALCRIM No. 3474, CALJIC No. 5.52.[17] (*Thomas*, *supra*, 219 Cal.App.3d at pp. 144–145.) After holding that Thomas had waived this argument because he "himself requested the instructions as they were given," the Court of Appeal went on to find no likelihood of confusion on the part of the jury, concluding that CALJIC No. 5.17 "is not a self-defense instruction at all. It merely removes the element of malice aforethought, while making it clear the person holding the defined belief still 'kills unlawfully.' On the other hand the self-defense instructions given here[18] start out with the words, '[i]t is lawful,' thus showing the essential difference between the concepts on which the jury is being instructed." (*Thomas*, *supra*, p. 145.) But in *Thomas*, the jury expressed no confusion about the instructions. Such was not the case here.

The Attorney General's brief goes on to address at length Brim's alternative argument that CALCRIM No. 3474 should have been modified or omitted, an argument we do not reach. (*Ante*, fn. 14.) He contends that Brim forfeited that argument, that CALCRIM Nos. 517 and 3474 are clear and correct statements of the law, and that the instructions as a whole, together with the arguments of counsel, demonstrate no reasonable likelihood that the jury misunderstood them.

But the presumption relied on by the Attorney General that jurors understood and followed the court's instructions applies only "[i]n the absence of any evidence of confusion on the part of the jury." (*People v. Forrest* (2017)

---

[17] "The right of self-defense exists only as long as the real or apparent threatened danger continues to exist. When the danger ceases to appear to exist, the right to use force in self-defense ends." (CALJIC No. 5.52.)

[18] It is unclear what "self-defense instructions" the *Thomas* court was referring to, but they may have included, for example, CALJIC No. 5.30 (Self-Defense Against Assault), which begins: "It is lawful for a person who is being assaulted to defend [himself] [herself] from attack if . . . ."

24

7 Cal.App.5th 1074, 1083; see *People v. Merriman* (2014) 60 Cal.4th 1, 48 [presumption that jury followed court's instructions applies "[a]bsent some showing to the contrary"]; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) And the fact remains that *after* a two-week trial, *after* hearing the arguments of counsel, *after* being instructed by the court, and *after* many hours of deliberations, the jury expressed confusion about the relationship between CALCRIM No. 3474 and imperfect self-defense, which the Attorney General's brief concedes was a "central issue at trial." As our colleagues in Division One well put it, "[w]here a jury has expressed confusion about a legal principle, it is no longer appropriate to assume that the jury can just 'figure it out' from the instructions as a whole. Instead, the focus must be on whether the trial court's answer was sufficient to dispel the confusion." (*People v. Doane* (2021) 66 Cal.App.5th 965, 983.)

So what of the jury's question? The Attorney General devotes barely more than a page of substantive argument to it, simply asserting that "the jury's request for additional clarification on the law is most reasonably understood as jurors exercising diligence during their deliberations in a complex area of the law," noting that we review a trial court's decision about how to respond to jury questions for abuse of discretion, and concluding that "[p]ointing the jury to the applicable law is hardly an arbitrary or capricious exercise" of that discretion.

To begin with, we know of no authority holding that questions from a deliberating jury on a critical issue of law can be so readily dismissed as jurors "exercising diligence," nor does the Attorney General offer any. Indeed, quite the opposite. (See, e.g., *People v. Thompkins* (1987) 195 Cal.App.3d 244, 252–253 (*Thompkins*) ["if jury instructions are important in general, there is no category of instructional error more prejudicial than

25

when the trial judge makes a mistake in responding to a jury's inquiry during deliberations"].)

As to "[p]ointing the jury to the applicable law," we acknowledge that it has been said that "the trial court does not abuse its discretion when it determines the best way to aid the jury is by directing the jury to reread the applicable jury instructions that 'are themselves full and complete.' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1017, quoting *People v. Gonzalez, supra*, 51 Cal.3d at p. 1213.)  And such was arguably the case with the jury's first two questions, where answers might be available upon a careful rereading of the instructions to which the trial court directed the jury.  But when the jury asked, based on an apparent misunderstanding of CALCRIM No. 3474, how that instruction was to be harmonized with CALCRIM No. 517, we fail to see how directing the jury to simply reread CALCRIM No. 517 (again) provided any "full and complete" answer to its question.  Nor did it "point[] the jury to the applicable law" with respect to its question which, as discussed, was to be found—if at all—by correlating several instructions, none of which was mentioned.  And all this when the answer to the jury's question was simply, "Yes."

Moreover, the Attorney General's argument proves too much.  The trial court's "general obligation" under section 1138 is to " 'clear up any instructional confusion expressed by the jury,' " not to point the jury to technically correct statements of the law.  (*People v. Dykes, supra*, 46 Cal.4th at p. 802; see *People v. Doane, supra*, 66 Cal.App.5th at p. 983; *People v. Fleming* (2018) 27 Cal.App.5th 754, 766 ["a trial court's response to a jury question can be erroneous even if it does not technically misstate the law"]; *People v. Gavin* (1971) 21 Cal.App.3d 408, 417–418 ["[t]he court's failure to

26

clear up the jury's confusion . . . was fundamentally unfair to the defendant"].)  In short, the trial court's answer was error.

We end discussion on this issue recognizing the dangers trial courts face in deviating from the standard instructions.  As the Fourth District Court of Appeal put it in *Thompkins*, *supra*, 195 Cal.App.3d 244, 252, "[e]ach member of this panel has served as a superior court judge and we are sensitive to the significant burdens of that office," and we "recognize that formulating a response to [jury] questions often requires consultation with counsel and significant independent legal research."  (*Id*. at p. 253.)  And we pause here to note that, based on our review of the record, the trial court here did a thoughtful and conscientious job with what was indisputably a lengthy and difficult trial—and jury deliberations.

But compared to "stray[ing] from the language of form instructions . . . [i]t is hardly preferable for a judge to merely repeat for a jury the text of an instruction it has already indicated it doesn't understand."  (*Thompkins*, *supra*, 195 Cal.App.3d at p. 253.)  Instead, the trial judge should "thoughtfully consider[] the jury's inquiry, clarif[y] it if necessary, stud[y] the applicable legal principles, and respond[] to the jury in as simple and direct a manner as possible."  (*Id*. at p. 253.)

We agree wholeheartedly, and in our view such is the teaching of *Beardslee*, where our Supreme Court acknowledged that although "comments diverging from the standard are often risky" and the trial court there "was understandably reluctant to strike out on its own," but nevertheless concluded that "a court must do more than figuratively throw up its hands and tell the jury it cannot help."  (*Beardslee*, *supra*, 53 Cal.3d at p. 97, citing *Thompkins*, *supra*, 195 Cal.App.3d at pp. 250–251.)  And—albeit in the civil context—the benchbook for judges espouses the same principle.  (See Cal.

27

Judges Benchbook:  Civil Proceedings—Trial (CJER 2025) Jury Deliberations and Conduct, § 13.40 ["When the jurors' question suggests that they have misunderstood the governing law, merely referring them to the instructions the judge has already given may be inadequate . . . Instead, the judge must give them an answer that is sufficient to dispel their confusion"], citing *People v. Doane*, *supra*, 66 Cal.App.5th at p. 982; see also Fairbank et al., Cal. Practice Guide:  Civil Trials and Evidence (The Rutter Group 2025) ¶ 15:132 [court's failure to " 'specifically guide the jury with appropriate instructions' " in response to juror requests "*may* constitute reversible error" where original instructions have left the jury " 'without a full understanding of the law applicable to the case, and this lack of understanding is brought to the attention of the court by the jury's request for further guidance' "].)

We do not mean to imply that the trial court's response to the jury's question here was not the result of thoughtful consideration.  Because of the lack of reporter's transcript, we are simply in the dark as to the prosecutor's position on the question and how the trial court arrived at its determination of how best to respond.  (See Cal. Judges Benchbook:  Civil Proceedings—Trial, *supra*, § 13.34 [noting that conference regarding jury questions "should be reported on the record if there is any disagreement, to note the objection that has been made"].)  But ultimately, the trial court here referred the jury back to the very instruction that confused them, an instruction that, as we have discussed, was confusing under the circumstances of this case.  To be sure, the trial court's response was a technically correct statement of the law, and its hesitation to go further quite understandable.  But the trial court's obligation is not to provide an answer beyond reproach from legal scholars or appellate court judges.  Quite simply, the instructions are not worth the paper they're printed on if the jury fails to understand them.  And what more

28

"simple and direct" answer could there have been to the jury's question than the one no party here disputes was also correct: "Yes"? (*Thompkins, supra,* 195 Cal.App.3d at p. 253.) This, we conclude, was what was required to exercise discretion "in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (*Bailey v. Taaffe, supra,* 29 Cal. at p. 424; *People v. Jacobs, supra,* 156 Cal.App.4th at pp. 737–738.)

**The Error Was Prejudicial**

A violation of section 1138 due to the trial court's failure to adequately answer a jury's question is subject to the prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Roberts* (1992) 2 Cal.4th 271, 326.) That standard requires us to evaluate whether the defendant has demonstrated that it is "reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson, supra,* at p. 836; *People v. Sivongxxay* (2017) 3 Cal.5th 151, 178.) In this context our Supreme Court has made clear that a reasonable probability " ' " 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " ' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 351; *People v. Eid* (2010) 187 Cal.App.4th 859, 882; *People v. Hodges, supra,* 213 Cal.App.4th at p. 539.)

Because the prosecution bore the burden of proving beyond a reasonable doubt that Brim did *not* act in imperfect self-defense, the question becomes whether "it is reasonably probable that one or more jurors would conclude that the prosecution failed to meet [this] burden" absent the error. (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025; see *Schuller, supra,* 15 Cal.5th at pp. 254–255; *People v. Hendrix* (2022) 13 Cal.5th 933, 947, fn. 6 (*Hendrix*) [hung jury is a "more favorable" outcome under *Watson*].)

29

We conclude there was such a reasonable probability here. As discussed, the jury's question demonstrated that one or more jurors may have erroneously believed, based on CALCRIM No. 3474, that they could not reduce Brim's murder conviction to one for voluntary manslaughter based on a theory of imperfect self-defense if he killed Williams after the danger Williams presented no longer objectively "exist[ed] or reasonably appear[ed] to exist."[19] (CALCRIM No. 3474.) The prosecutor argued at length that the video showed just such an end to any danger presented by Williams once Brim obtained control of the knife toward the end of their altercation. And the jury's rejection of Brim's claim of perfect self-defense, together with their questions focused on voluntary manslaughter, suggest that they may have agreed that there was an objective end to any danger while still crediting Brim's testimony that he subjectively feared for his life. There is a " ' " '*reasonable chance*, more than an *abstract possibility*,' " ' " that had the trial court cleared up the jury's confusion regarding CALCRIM No. 3474, at least one juror would have voted to acquit Brim of murder. (*People v. Wilkins*, *supra*, 56 Cal.4th at p. 351.)

The Attorney General argues that any error was harmless under *Watson*, "[g]iven the strong evidence of [Brim]'s guilt, and the weakness of his defense." He further asserts that Brim's "inconsistent and implausible testimony painted appellant as a liar, rendering his defense entirely incredible." We cannot agree.

---

[19]    To the extent that the trial court's failure to clear up the jury's confusion allowed it to convict Brim of murder based on this invalid theory, reversal is required. (See *People v. Fleming*, *supra*, 27 Cal.App.5th at p. 770; *In re Lopez* (2023) 14 Cal.5th 562, 580; *People v. Chun* (2009) 45 Cal.4th 1172, 1201, superseded by statute on another ground as stated in *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–249.)

Our Supreme Court's decision in *Hendrix*, *supra*, 13 Cal.5th 933 is instructive. There, Hendrix was captured on surveillance video at a house in Oxnard, where he attempted to break in. (*Id.* at p. 936.) When the police arrived, Hendrix claimed to be looking for his friend Trevor, and "asserted that a friend told him Trevor moved there." (*Id.* at p. 937.) Hendrix was charged with first degree burglary, and at trial the court erroneously gave the general intent version of the CALCRIM jury instruction on mistake of fact, which version required that such mistake be reasonable. (*Id.* at pp. 938–939; see CALCRIM No. 3406.) The Court of Appeal held that the error was harmless under *Watson*, but our Supreme Court reversed. (*Id.* at p. 950.) Because "[t]he misinstruction . . . effectively operated to impose an unwarranted reasonableness requirement on Hendrix's mistake of fact claim," "[c]ompeting assessments of Hendrix's mental state occupied the vast majority of closing argument," and it "appear[ed] the jury did not find this to be an open-and-shut case, despite the fact that Hendrix's actions . . . were recorded on video," based on the jury's having deadlocked and "requested a transcript or readback of Hendrix's jailhouse phone calls, suggesting a particular concern with . . . Hendrix's intentions," our Supreme Court concluded that the error was not harmless. (*Id.* at pp. 944–945, 947, 949–950.)

A similar analysis applies here. The jury's confusion regarding CALCRIM No. 3474 and the trial court's failure to resolve it may have "imposed an unwarranted reasonableness requirement" on Brim's claim of imperfect self-defense, at least in the minds of one or more members of the jury. (*Hendrix*, *supra*, at p. 945.) Brim's mental state "occupied the vast majority of closing argument"—indeed, it was the primary question for the jury's decision. (*Id.* at p. 945.) And the jury here, as in *Hendrix*, apparently

31

deadlocked during its deliberations, and asked multiple questions demonstrating it was "particular[ly] concern[ed] with" Brim's intentions, "despite the fact that [Brim]'s actions . . . were recorded on video." (*Id*. at p. 947.)

In evaluating the record for harmless error under *Watson*, we do not "step[] into the role of the jury," and we "may not . . . rest a harmless error ruling on [our] own reweighing or reinterpretation of the evidence." (*Hendrix*, *supra*, 13 Cal.5th at p. 948.) As the Attorney General concedes, "[i]ntent was the only issue at trial." Had the trial court disabused the jury of its apparent misunderstanding of CALCRIM No. 3474, we could be sure the jury understood that in order to reduce Brim's murder conviction to voluntary manslaughter, Brim's belief in the need to use deadly force in self-defense did not need to be objectively reasonable; it was enough if it was genuinely held. The question, properly understood, would thus have been purely one of Brim's credibility. We cannot say with confidence how the jury would have answered this question, but we cannot—and must not—answer it ourselves. (See *Hendrix*, *supra*, 13 Cal.5th at pp. 948–949; *People v. Hovarter* (2008) 44 Cal.4th 983, 996 [" 'the trier of fact is the sole arbiter of the credibility of a witness' "].) While Brim's version of events may not have been completely compelling, it was certainly not "entirely incredible"—the prosecution not disputing, for example, that Williams initiated at least their initial confrontation, that he was a bigger man than Brim, and that he escalated the altercation by drawing a knife and attempting to stab Brim. The jury apparently agreed that the case was not "open-and-shut," as demonstrated by their lengthy deliberations, multiple questions, requests to review certain of the evidence, and at one point, apparent deadlock. (*Hendrix*, *supra*, 13 Cal.5th at p. 947.)

In short, we conclude there is a " ' " '*reasonable chance*, more than an *abstract possibility*' " ' " that the jury would have reached a different verdict (or no verdict) but for the trial court's error, and our review of the record "leaves us ' "in serious doubt as to whether the error affected the result." ' " (*People v. Wilkins*, *supra*, 56 Cal.4th at p. 351; *Hendrix*, *supra*, 13 Cal.5th at p. 946, quoting *People v. Mower* (2002) 28 Cal.4th 457, 484.) Accordingly, the judgment cannot stand.

Finally, a word as to remedy. " 'An appellate court is not restricted to the remedies of affirming or reversing a judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial.' " (*People v. Edwards* (1985) 39 Cal.3d 107, 118; see § 1260.)

Our review of the record shows that Brim's second degree murder conviction is supported by substantial evidence, and Brim does not contend otherwise. And the error in responding to the jury's third question regarding CALCRIM No. 3474 could not have affected its rejection of the exonerating possibility of perfect self-defense, because that instruction does apply to such possibility. Under these circumstances, we will modify the judgment to reflect Brim's conviction for voluntary manslaughter instead of second degree murder. (See *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1151; *People v. Thomas* (2013) 218 Cal.App.4th 630, 647.)

## DISPOSITION

Brim's conviction for second degree murder is reversed. The People shall have 60 days from issuance of the remittitur to determine whether to retry Brim for murder. Should the People elect not to do so, the judgment shall be modified to reflect Brim's conviction for voluntary manslaughter

33

instead of second degree murder, and the judgment as modified is affirmed. In the event the judgment is modified, the trial court shall resentence Brim accordingly.

_____

RICHMAN, ACTING P.J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

(A170747P)

Alameda County Superior Court

Trial Judge:      Jennifer Madden, Judge

Counsel:

Cliff Gardner, under appointment by the Court of Appeal, and Lazuli Whitt, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Sarah J. Farhat and Christen Somerville, Deputy Attorneys General for Plaintiff and Respondent.